COMMONWEALTH of Pennsylvania,
Appellee,

v.

Loring WEST, Appellant.

Superior Court of Pennsylvania.

Argued March 11, 2003.

Filed Oct. 10, 2003.

Matthew T. Budash, Indiana, for appellant.

Michael Handler, Asst. Dist. Atty., Indiana, for Com., appellee.

BEFORE: TODD, BENDER, and KELLY, JJ.

OPINION BY KELLY, J.:

¶ 1 In this appeal we must determine whether the trial court properly refused to suppress the results of two blood alcohol tests performed on Appellant at two different hospitals following a motor vehicle accident. We hold the trial court properly admitted into evidence at trial the results of Appellant's blood test from Allegheny General Hospital, because this blood draw was conducted for independent medical purposes and the police obtained a properly executed search warrant before requesting the results. We also hold that the trial court should not have admitted the results of Appellant's previous blood test performed at Indiana Hospital, because there was no evidence in the certified record that the hospital performed this test for independent medical purposes, or pursuant to the mandates of 75 Pa.C.S.A. § 3755. Nevertheless, we hold the erroneous admission at trial of the Indiana Hospital blood test results constituted harmless error. Accordingly, we affirm.

¶ 2 The relevant facts and procedural history of the case are as follows:

At approximately 2:11 a.m. on February 14, 2002, a two car accident occurred in Indiana Borough, Indiana County at the intersection of 13th and Church Streets. The [Appellant] was the operator of one vehicle and the other vehicle was occupied by Brandon Conley and Earl Williamson. Both Conley and Williamson were killed in the accident.

Immediately following the accident Patrolman Brian Murphy of the Indiana Borough Police Department arrived at the scene. After summoning back-up, medical assistance and fire assistance, Patrolman Murphy began investigating the accident. A small crowd of people had assembled at the scene and Patrolman Murphy inquired who was the operator of [Appellant's] vehicle. [Appellant] volunteered at this time that he was the operator of the vehicle.

Patrolman Murphy observed [Appellant] seated on the grass near the accident scene. [Appellant] showed obvious signs of injury. The Patrolman detected an odor of alcohol about the person of [Appellant], found him to be unsteady on his feet, to have blood shot and glassy eyes and exhibiting radical mood changes. [Appellant] indicated that he had been drinking prior to the accident. [Appellant] was then placed under arrest for driving under the influence of alcohol, handcuffed and secured in the rear seat of the police vehicle.

Ambulance personnel, after examining Mr. Conley and Mr. Williamson, examined [Appellant]. A determination was made that [Appellant] should be transferred to the Indiana Hospital for further evaluation and treatment. Patrolman Murphy accompanied [Appellant] to the hospital in the ambulance.

At approximately 3:15 a.m., while at the hospital, Patrolman Murphy was informed by hospital personnel that both Mr. Conley and Mr. Williamson were deceased. Thereafter, Patrolman Murphy talked to [Appellant] about a blood test and urine test. Patrolman Murphy, based on misinformation provided by other police officers, informed [Appellant] that if he did not consent to the tests they would still be conducted. After a short period of deliberation [Appellant] then consented to the tests.

The urine sample was collected at 3:25 a.m. and a blood sample was collected at 3:40 a.m. The blood sample was pack-

aged in an evidence kit and turned over to Patrolman Murphy.

At some point after the initial blood draw the Indiana County District Attorney Robert S. Bell, Esq. and an Indiana County Assistant District Attorney Michael Handler, Esq. arrived at the hospital. Mr. Bell had been to the scene of the accident and had been informed by an officer at the scene of the circumstances [of the] first blood draw. Upon arrival at the hospital, District Attorney Bell informed Patrolman Murphy that he had gotten bad advice and that there was a potential problem with the first draw.

While discussing the case with Mr. Handler, Patrolman Murphy and Indiana Borough Police Chief Sutton in the hallway of the Emergency Room, Mr. Bell and the others were approached by an unidentified nurse and informed that there was going to be a second blood draw for medical purposes or for medical reasons.

A decision was made to transport [Appellant] to Allegheny General Hospital in Pittsburgh for further treatment. [Appellant] was to be transported to Allegheny General Hospital *via* Life Flight Helicopter stationed at Indiana Hospital. As the Life Flight crew prepared [Appellant] for transport a second draw of blood from [Appellant] was made. This draw was made at 4:45 a.m. and according to the Indiana Hospital Records was authorized by Bernard Geiser, M.D. The blood draw was kept by Indiana Hospital.

[Appellant] was then taken to Allegheny General Hospital. The hospital records indicate that [Appellant] arrived at Allegheny General Hospital at 5:32 a.m. and that he was admitted to the hospital at 5:40 a.m. A third draw of blood was taken at Allegheny General Hospital from [Appellant]. The hospital records indicate that the draw took place at 5:10 a.m. which is inconsistent with the arrival and admission times.

(Trial Court Opinion, filed January 18, 2002, at 1–4). Officer Murphy subsequently obtained a warrant for Appellant's blood test results from Indiana Hospital and Allegheny General Hospital. Prior to trial, Appellant filed a motion to suppress the blood alcohol tests on his blood and urine samples obtained at Indiana Hospital, and the blood samples obtained at Allegheny General Hospital. The court suppressed the first blood draw and urine sample obtained at Indiana Hospital. However, the court refused to suppress the results of subsequent blood tests taken at Indiana Hospital and Allegheny General Hospital, respectively.

¶ 3 At trial, Appellant objected to the admission of the two blood tests. The court permitted the Commonwealth to introduce the results of the blood tests over Appellant's objection. The second Indiana Hospital blood draw registered Appellant's BAC at 0.121%. The Allegheny Hospital blood draw registered Appellant's BAC at 0.106%. Appellant was convicted of (1) two counts of homicide by vehicle while under the influence [1]; (2) one count of accident involving death or personal injury while not properly licensed [2]; (3) two counts of homicide by vehicle [3]; (4) two counts of involuntary manslaughter [4]; (5) one count of driving under the influence of alcohol, incapable of safe driving [5]; (6) one

1.  75 Pa.C.S.A. § 3735(a).

2.  75 Pa.C.S.A. § 3742.1(a).

3.  75 Pa.C.S.A. § 3732.

4.  75 Pa.C.S.A. § 2504(a).

5.  75 Pa.C.S.A. § 3731(a)(1).

count of driving under the influence blood-alcohol content at time of operation .10% or greater [6]; (7) one count possession of small amount of marijuana [7]; (8) one count of reckless driving [8]; (9) one count of stop signs and yield signs violated [9]; (10) one count of driving under suspension [10]; (11) one count of driving at unsafe speed,[11] and; (12) one count of registration and certificate of title required.[12] The court sentenced Appellant to an aggregate sentence of 10½–30 years' incarceration, plus fines and costs. This timely appeal followed.

¶ 4 Appellant raises the following issue on appeal:

> DID THE TRIAL COURT ERR IN REFUSING TO SUPPRESS THE TWO BLOOD TESTS AT ISSUE, THE FIRST CONDUCTED ON BLOOD DRAWN FROM [APPELLANT] AT INDIANA HOSPITAL AND THE SECOND CONDUCTED ON BLOOD DRAWN FROM [APPELLANT] AT ALLEGHENY GENERAL HOSPITAL?

(Appellant's Brief at 3).

■ ¶ 5 Initially, we note that in reviewing a suppression order:

> Our scope of review is limited primarily to questions of law. We are bound by the suppression court's findings of fact, if those findings are supported by the record. In determining whether the findings of fact are supported by the record, we are to consider only the evidence of the appellee and so much of the evidence of the Commonwealth which, as a whole, remains uncontradicted. It is for the suppression court as trier of fact to determine credibility. **We are not bound by findings wholly lacking in evidence.** Nor are we bound by the suppression court's conclusion[s] of law. *Commonwealth v. Roland,* 701 A.2d 1360, 1361 (Pa.Super.1997) (internal citations omitted) (emphasis added).

■ ¶ 6 Where a defendant files a motion to suppress, the burdens of production and persuasion are on the Commonwealth to prove the challenged evidence was not obtained in violation of the defendant's rights. *See Commonwealth v. Wilmington,* 729 A.2d 1160, 1163 (Pa.Super.1999), *appeal denied,* 565 Pa. 644, 771 A.2d 1284 (2001) (citing Pa.R.Crim.P. 581(H) (formerly Rule 323(H))).

¶ 7 On appeal, Appellant challenges the admissibility of the results of two separate blood draws at two independent hospitals. For ease of disposition, we address the blood draws separately, beginning with the blood test performed at Allegheny General Hospital. Appellant maintains the blood test conducted by Allegheny General Hospital was unreliable, because the blood draw took place more than three hours after the deadly crash, and the Commonwealth failed to show when the blood was actually drawn. As a result, Appellant submits the blood test done at Allegheny General Hospital, and the corresponding relation-back evidence at trial, were unreliable. Appellant concludes the test results should have been suppressed. We must disagree.

¶ 8 The Pennsylvania Legislature enacted two statutes to allow law enforcement to preserve blood samples of a person

---

6. 75 Pa.C.S.A. § 3731(a)(4).

7. 35 P.S. § 780–113(a)(31).

8. 75 Pa.C.S.A. § 3736(a).

9. 75 Pa.C.S.A. § 3323(b).

10. 75 Pa.C.S.A. § 1543(a).

11. 75 Pa.C.S.A. § 3361.

12. 75 Pa.C.S.A. § 1301(a).

suspected of driving under the influence of drugs or alcohol. *See* 75 Pa.C.S.A. §§ 1547 and 3755. Section 1547 in pertinent part provides:

### § 1547. Chemical testing to determine amount of alcohol or controlled substance

(a) **General rule.**—Any person who drives, operates or is in actual physical control of the movement of a motor vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath, blood or urine for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a motor vehicle:

(1) while under the influence of alcohol or a controlled substance or both; or

(2) which was involved in an accident in which the operator or passenger of any vehicle involved or a pedestrian required treatment at a medical facility or was killed.

(b) **Suspension for refusal.**—

(1) If any person placed under arrest for a violation of section 3731 (relating to driving under influence of alcohol or controlled substance) is requested to submit to chemical testing and refuses to do so, the **testing shall not be conducted** but upon notice by the police officer, the department shall suspend the operating privilege of the person for a period of 12 months.

(2) It shall be the duty of the police officer to inform the person that the person's operating privilege will be suspended upon refusal to submit to chemical testing.

(c) **Test results admissible in evidence.**—In any summary proceeding or criminal proceeding in which the defendant is charged with a violation of section 3731 or any other violation of this title arising out of the same action, the amount of alcohol or controlled substance in the defendant's blood, as shown by chemical testing of the person's breath, blood or urine, which tests were conducted by qualified persons using approved equipment, shall be admissible in evidence.

\* \* \*

(e) **Refusal admissible in evidence.**— In any summary proceeding or criminal proceeding in which the defendant is charged with a violation of section 3731 or any other violation of this title arising out of the same action, the fact that the defendant refused to submit to chemical testing as required by subsection (a) may be introduced in evidence along with other testimony concerning the circumstances of the refusal. No presumptions shall arise from this evidence but it may be considered along with other factors concerning the charge.

75 Pa.C.S.A. § 1547 (emphasis added). Section 3755 in relevant part states:

### § 3755. Reports by emergency room personnel

(a) **General rule.**—If, as a result of a motor vehicle accident, the person who drove, operated or was in actual physical control of the movement of any involved motor vehicle requires medical treatment in an emergency room of a hospital and if probable cause exists to believe a violation of section 3731 (relating to driving under influence of alcohol or controlled substance) was involved, the emergency room physician or his designee shall promptly take blood samples from those persons and transmit them within 24 hours for testing to the

Department of Health or a clinical laboratory licensed and approved by the Department of Health and specifically designated for this purpose. This section shall be applicable to all injured occupants who were capable of motor vehicle operation if the operator or person in actual physical control of the movement of the motor vehicle cannot be determined. Test results shall be released upon request of the person tested, his attorney, his physician or governmental officials or agencies.

75 Pa.C.S.A. § 3755(a). In construing these statutes, our Supreme Court has stated, "Section 3755 and the implied consent law, 75 Pa.C.S.[A.] § 1547, comprise a statutory scheme which both implies the consent of a driver to undergo blood testing in certain circumstances and requires hospital personnel to release the blood test results at the request of, among others, a police officer." *Commonwealth v. Shaw,* 564 Pa. 617, 622, 770 A.2d 295 (2001).

¶ 9 In *Shaw,* police responded to a two-vehicle accident. Upon arrival, an officer inspected a van involved in the accident. The officer observed a cooler containing several unopened beer cans and several empty beer cans throughout the van. The driver of the van (the appellant) had been transported to the hospital before officers arrived at the scene. An officer went to the hospital to question the appellant. The appellant admitted to the officer that he had been the driver of the van. The officer noticed the appellant's eyes were bloodshot and glassy, his speech was slurred, and he smelled of alcohol. The officer advised the appellant of his *Miranda* rights and the implied consent provision of 75 Pa.C.S.A. § 1547, and informed the appellant that the hospital would be taking blood for treatment purposes. Later, the hospital drew blood from the appellant for independent medical purposes. The officer then obtained

the results of that blood test which revealed a BAC of .267%.

¶ 10 The Commonwealth charged the appellant with two counts of DUI. The investigating officer subsequently obtained the formal written results of the appellant's blood tests through the issuance of a subpoena. The appellant filed a pretrial motion to suppress the BAC results of the blood test. The trial court denied the appellant's motion and convicted him at a bench trial. *Shaw, supra* at 619–20, 770 A.2d at 296–97. On appeal, this Court upheld the trial court's denial of the appellant's motion to suppress. *Commonwealth v. Shaw,* 718 A.2d 348 (Pa.Super.1998) (unpublished memorandum).

¶ 11 Our Supreme Court stated the question to be answered in *Shaw* was whether "the failure of [the officer] to request that the hospital perform BAC testing under § 3755(a), [rendered the officer's] subsequent warrantless acquisition of [the] appellant's BAC test illegal under the Pennsylvania Constitution[?]" In holding that the warrantless acquisition of the appellant's BAC results violated Article 1 Section 8 of the Pennsylvania Constitution, the Court stated:

Section 3755(a), by its plain language, requires **hospital personnel**, in cases where probable cause exists to believe that an emergency room patient has violated Pennsylvania's DUI statute, to take blood samples for BAC testing. There is **no** requirement in the statute that the BAC testing be conducted at the **request** of a **police officer**. The only requirement is the abstract requirement that "probable cause exists to believe a violation of Section 3731." If such "probable cause exists," then hospital personnel must take blood samples for BAC testing. This, however, is not a case where a blood sample has been

taken pursuant to Section 3755. It is undisputed that Appellant's BAC test was conducted for independent medical purposes. There was no request by [the officer] that a BAC test be performed, nor did hospital personnel perform the BAC test as a **result of any perceived duty arising out of the abstract probable cause requirement in Section 3755.**

Accordingly, as Appellant's BAC test was not conducted pursuant to Section 3755(a), the release of the result of the BAC test at the request of [the officer] was not authorized by Section 3755(a), nor is there any other statutory basis for releasing the result. The question then becomes whether **the release** of the result violates Article 1, Section 8 of the Pennsylvania Constitution[?]

*Id.* at 622–23, 770 A.2d at 298–99 (some emphasis added) (footnote omitted). The Court concluded its analysis by stating:

The implied consent provision of 75 Pa. C.S. § 1547(a)(1) does not eliminate the need to obtain a warrant to seize medical records, but only to request and conduct chemical tests. The reason for this is obvious. Due to the evanescent nature of the evidence of blood alcohol content, there is an immediate need to obtain samples of blood for testing. When blood samples have been drawn for medical purposes and the results of blood alcohol content tests are part of a patient's medical record, the evidence will not have dissipated during the time that application for a search warrant is being made.

Thus, the release of the result of Appellant's BAC test, taken for **independent medical purposes** and not pursuant to Section 3755(a), to [the officer] **without a warrant** and in the absence of exigent circumstances, violated Article 1, Section 8 of the Pennsylvania Constitution. Ac-

cordingly, the BAC test results should have been suppressed.

*Id.* at 624, 770 A.2d at 299 (internal citation omitted) (emphasis added). *Compare Commonwealth v. Keller,* 823 A.2d 1004 (Pa.Super.2003) (holding where police officer specifically requested BAC test be performed on defendant at hospital, and defendant did not dispute police officer's probable cause to believe defendant drove under influence of alcohol, defendant's consent to undergo blood test was implied and hospital was required to release BAC results).

¶ 12 Our legislature has defined the offense of driving under the influence, in pertinent part, as follows:

### § 3731. Driving under influence of alcohol or controlled substance

**(a) Offense defined.**—A person shall not drive, operate or be in actual physical control of a vehicle in any of the following circumstances:

(1) While under the influence of alcohol to a degree which renders the person incapable of safe driving.

\* \* \*

(4) While the amount of alcohol by weight in the blood of:

(i) an adult is 0.10% or greater;

\* \* \*

**(a.1) Prima facie evidence.**—

(1) It is *prima facie* evidence that:

(i) an adult had 0.10% or more by weight of alcohol in his or her blood at the time of driving, operating or being in actual physical control of the movement of any vehicle if the amount of alcohol by weight in the blood of the person is equal to or greater than 0.10% at the time a chemical test is performed on a

sample of the person's breath, blood or urine;

75 Pa.C.S.A. § 3731(a.1)(1)(i). The general standard of subsection (a)(1):

[P]ermits proof of the offense by any evidentiary means, including evidence of outward symptoms such as bloodshot eyes, irregular driving patterns, odor of alcohol, slurred speech, admissions of drinking, etc.

* * *

Along with other types of evidence, BAC evidence may also be used to prove charges under subsection (a)(1). Thus: where a defendant is charged with a violation of section 3731(a)(1), a .10% test result is but one piece of evidence to be considered in deciding whether the person was under the influence. No expert testimony is needed in order for BAC evidence to be admissible in a conviction for (a)(1) since a defendant may be convicted of that offense despite the fact that the defendant's blood-alcohol level could not be related back to the time of the defendant's driving. The amount of time elapsed between the time of last driving and the blood sample **is not** dispositive of its admissibility in a prosecution under subsection (a)(1) but only affects the weight of the evidence, which is fully subject to attack through evidence for the defendant.

*Commonwealth v. Zugay*, 745 A.2d 639, 646–647 (Pa.Super.2000), *appeal denied*, 568 Pa. 662, 795 A.2d 976 (2000) (internal citations and quotation marks omitted) (emphasis added). Subsection (a)(4) does not specify a requisite period of time after driving within which BAC results may not exceed a specified level:

[B]ut instead strictly prohibits driving while exceeding the proscribed limit, the Commonwealth has often presented expert relation-back testimony in close cases to extrapolate or "relate back" the test results, in order to prove what the defendant's BAC would likely have been while driving.

*Id.* at 647 (emphasis omitted).

¶ 13 In the instant case, Allegheny General Hospital administered Appellant's third blood test shortly after his arrival at 5:40 a.m. It is undisputed that this draw was taken for independent medical purposes. No police officers or members of the Indiana County District Attorney's Office contacted anyone at Allegheny General to request this testing. The parties do dispute the actual time when the draw took place. Hospital records incorrectly indicate that this draw occurred at 5:10 a.m.

¶ 14 However, Victor Tomko, a paramedic at Allegheny General Hospital stated he drew Appellant's blood at 5:50 a.m. (N.T. Trial, 2/11/02, at 309). Further, it is uncontroverted that the police obtained a warrant before requesting the results of Appellant's Allegheny General Hospital blood test. Therefore, because the blood draw was conducted for medical purposes, and the results of this blood test were obtained after the proper execution of a search warrant, the results of the blood draw were properly admitted into evidence at Appellant's trial. *See Shaw, supra.*

¶ 15 Further, Paramedic Tomko provided an accurate time for the third blood draw. This made it possible for both Appellant and the Commonwealth to present expert relation-back testimony at trial. Dr. Karl Williams, the Commonwealth's relation-back expert, based his calculations on the 0.106% BAC result taken at 5:50 a.m. (N.T. Trial, February 11, 2002, at 491–492). Dr. Williams determined to a reasonable degree of medical certainty that Appellant's BAC at 2:11 a.m., the time of the accident, would have been 0.130%.

*Id.* at 493. Thus, Appellant's BAC had been over the legal limit of .10% at the time of the accident. While Appellant's expert, Dr. Frederick Fochtman, attempted to cast doubt on the findings and methods used by Dr. Williams, the jury resolved this conflicting testimony in favor of Dr. Williams. Therefore, Appellant's argument that the relation back evidence was unreliable is without merit. *See Commonwealth v. Gillen,* 798 A.2d 225 (Pa.Super.2002) (holding mere conflict in testimony does not render evidence insufficient to support verdict because it is with province of fact finder to determine weight to be given to testimony and to believe all, part, or none of evidence). Additionally, the fact that the Allegheny General Hospital blood draw occurred more than three hours after Appellant's automobile accident is not dispositive of its admissibility. Thus, Appellant's challenge does not provide a basis upon which to disturb the decision of the trial court. *See Zugay, supra.*

¶ 16 Appellant also contends the trial court should have suppressed the results of the second blood draw at Indiana Hospital. Appellant argues the Commonwealth failed to meet its burden to show the second blood draw was in compliance with the applicable law, and the court's decision to admit it was based on conjecture. After reviewing the record, we are compelled to agree with Appellant's contention regarding the second blood draw at Indiana Hospital. In light of the properly admitted blood test results from Allegheny General Hospital, however, the admission of the blood test results from the Indiana Hospital draw constituted harmless error and Appellant's convictions must stand.

¶ 17 We begin our analysis by observing:

The courts of this Commonwealth have continued to recognize that the citizens of Pennsylvania have a reasonable expectation of privacy in their medical records. We note, however, that although Appellant has an expectation of privacy in [his] medical records, this privacy interest does not preclude all searches and seizures of medical records. The proper function of...Art. I, § 8 of the Pennsylvania Constitution, is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner. Therefore, Appellant's privacy interest [in his medical records] is subject to reasonable searches and seizures.

*Commonwealth v. Barton,* 456 Pa.Super. 290, 690 A.2d 293, 296 (1997), *appeal denied,* 549 Pa. 695, 700 A.2d 437 (1997) (internal citations and quotation marks omitted).

¶ 18 Not all errors at trial, however, entitle an appellant to a new trial, and:

The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial....

This Court has stated that an error may be harmless where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict. Under this approach, a reviewing court first determines whether the untainted evidence, considered independently of the tainted evidence, overwhelmingly establishes the defendant's guilt. If honest, fair-minded jurors might very well have brought in not guilty verdicts, an error cannot be harmless on the basis of overwhelming evidence. Once the court determines that

the evidence of guilt is overwhelming, it then decides if the error was so insignificant by comparison that it could not have contributed to the verdict. We have cautioned that: A conclusion that the properly admitted evidence is so overwhelming and the prejudicial effect of the...error is so insignificant by comparison, that it is clear beyond a reasonable doubt that the error is harmless, is not to be arrived at lightly.

Accordingly, we have been reluctant to find an error harmless on the basis of overwhelming evidence. In applying the harmless error analysis in a particular case, it is imperative that the burden of establishing that the error is harmless beyond a reasonable doubt rests upon the Commonwealth.

*Commonwealth v. Drummond*, 775 A.2d 849, 853 (Pa.Super.2001), *appeal denied*, 567 Pa. 756, 790 A.2d 1013 (2001) (internal citations and quotations omitted).

¶ 19 In the instant case, Indiana Hospital conducted a second blood draw from Appellant just before he was moved to Allegheny General Hospital. The notes of testimony indicate Nancy Moore, the nurse in charge of the emergency room on February 14, 2001, drew blood from Appellant at 4:45 a.m. Appellant had already been discharged from Indiana Hospital fifteen minutes earlier. The notes of testimony also reveal that Ms. Moore conducted this draw at the request of Dr. Bernard Geiser.

¶ 20 Indiana Borough Police Officer Brian Murphy testified about the events which unfolded in the Indiana Hospital emergency room shortly before Appellant's second blood draw:

[APPELLANT'S COUNSEL]: And do you recall whether or not the two representatives from the District Attorney's Office wanted a second blood test after you had told them that you told [Appellant] that blood could be forced from him?

[OFFICER MURPHY]: There was some discussion between members of the District Attorney's Office and me in the hallway area of the emergency room at Indiana Hospital. At one point during that conversation a nurse may have overheard what we were saying and through some means which I am not privy to, I don't know what exactly occurred. The nurse subsequently was, in some manner, involved in taking a blood test for legal means, I am sorry, for medical needs.

[APPELLANT'S COUNSEL]: And how do you know the nurse overheard the three of you talking about this?

[OFFICER MURPHY]: That is an assumption.

[APPELLANT'S COUNSEL]: Who was the nurse?

[OFFICER MURPHY]: I do not know her name.

[APPELLANT'S COUNSEL]: Was it a woman?

[OFFICER MURPHY]: Yes.

[APPELLANT'S COUNSEL]: Okay. And how long after that point in time was the second blood test taken?

[OFFICER MURPHY]: I don't know the timeframe.

[APPELLANT'S COUNSEL]: And you testified last time District Attorney Bell talked to the doctor before the second blood test. Do you recall that testimony?

[OFFICER MURPHY]: Yes.

[APPELLANT'S COUNSEL]: Okay. Do you know whether or not Assistant District Attorney Handler also spoke to the doctor before the second blood test?

[OFFICER MURPHY]: I don't know if Mr. Handler did or not. I am not even certain as to the accuracy of that state-

ment I made at the hearing last month as far as Mr. Bell talking with the doctor. There was a group of people in the hallway involved in conversation. I don't know what all the conversations were.

(N.T. Suppression Hearing, 12/5/01, at 11–12).

¶ 21 Robert Bell, Indiana County's District Attorney, provided his own recollections of the emergency room conversations:

> Yes. Sometime during the conversation that was going on between myself, Mike Handler and [Police] Chief Sutton, it was in that, that conversation took place in sort of a hallway within the emergency room itself. When you go into the Indiana ER you go through a set of double doors that open automatically when you get to them and you go through a second set of doors that takes you into the emergency room area. We were standing inside of that second set of doors outside of one of the rooms and the room we were standing outside of did not have the defendant in [it] because we were later in that room. And as we were back there talking one of the nurses came past us. And the emergency room isn't probably as crowded as a big city emergency room but there was a lot of activity going on there that night. The nurse stopped and at one point in time and she had carried on a small conversation basically on the condition of [Appellant] and things along those lines. I don't know that she overheard us or why she decided to stop but during our conversation she stopped and indicated that there was going to be a medical draw. She wasn't asking us for permission and she just mentioned it to us so I have to assume that she overheard the conversation regarding the possible problems with the legal draw

but she dated [sic] there was going to be a medical draw.

(*Id.* at 43–44).

¶ 22 While the testimony from Officer Murphy and District Attorney Bell helps to clarify some of what happened in the Indiana Hospital emergency room on the night in question, the certified record is devoid of any further evidence supporting the Commonwealth's contention that this second blood draw occurred for independent medical purposes. Nurse Moore and Mr. Bell testified to the fact that Dr. Geiser ordered this second blood draw. No witnesses testified about any independent medical purpose that caused Dr. Geiser to order the second test, and Dr. Geiser did not testify. Thus, we cannot know for certain what motivated him to order this test after Appellant had already been discharged from the hospital's care.

¶ 23 Further, Nurse Moore's testimony does not explain any independent medical purpose for this blood draw. Ms. Moore revealed only that she drew Appellant's blood at the direction of Dr. Geiser. (N.T. Trial at 39). She did not provide any further information as to why Appellant's blood was being drawn a second time or that Appellant's blood was being drawn pursuant to any Indiana Hospital emergency room policy or procedure. *Id.* at 43.

¶ 24 The trial court explains away these deficiencies in the record by stating that a blood draw for independent medical purposes can occur for a variety of reasons. (Trial Court Opinion at 8). The court suggests that there might have been a hospital policy that blood be drawn or that the blood may have been drawn in compliance with 75 Pa.C.S.A. § 3755. Nevertheless, there is no evidence in the certified record to support these theories. *See Shaw, supra.* Thus, the record does not support the court's finding of an independent medical purpose behind the second

blood draw taken at Indiana Hospital. *See Roland, supra.*

¶ 25 Furthermore, the Commonwealth has done little to advance its theory that the second blood draw was conducted for any independent medical purpose. Dr. Geiser did not testify. Nurse Moore did not testify about any medical need for the test, or about any Indiana Hospital policy mandating the second blood draw. District Attorney Bell testified an emergency room nurse told him a medical blood draw would occur **prior to Appellant's discharge**. Mr. Bell did not further explain the medical purpose of this blood draw. The Commonwealth did not present any additional evidence to support its claim that hospital personnel conducted this blood draw for its own purposes. In light of the fact that Appellant had already been discharged from Indiana Hospital when the second blood draw occurred, a statement that the blood test was done for medical purposes does not suffice. *Id.* The Commonwealth should have produced evidence showing what the "independent medical purpose" was, or evidence to prove that the blood was drawn pursuant to a "perceived duty" by Indiana Hospital arising out of Section 3755. *See id.; Shaw, supra.* Without more, we cannot say the contested Indiana Hospital blood draw was in compliance with the law. As such, the trial court should have suppressed those results. *See Wilmington, supra;* Pa. R.Crim.P 581(H).

¶ 26 The Commonwealth also argues that Pennsylvania's statutory scheme creates two different types of legal blood draws. Under Section 1547(a), a police officer with reasonable grounds to believe a motorist has operated a vehicle under the influence of alcohol may request a blood sample for testing purposes. 75 Pa. C.S.A. § 1547(a). If the motorist refuses, testing will not be conducted and the mo-

torist's license will be suspended for one year. 75 Pa.C.S.A. § 1547(b). Section 3755(a) requires emergency room personnel to draw blood and forward it to an approved lab for testing when (1) a driver involved in an accident needs hospitalization and, (2) there is probable cause to believe that the operator was under the influence of alcohol. 75 Pa.C.S.A. § 3755. The Commonwealth and the trial court do not posit that the facts of the instant case dictate a Section 1547(a) analysis. *See Commonwealth v. Shaffer,* 714 A.2d 1035 (Pa.Super.1998) (holding search of blood alcohol tests not permitted under Section 1547 where suspect under arrest and police did not request testing). However, both believe that the second Indiana Hospital blood draw was permissible under Section 3755(a). We are constrained to disagree.

¶ 27 Here, the evidence presented by the Commonwealth attempted to prove that Indiana Hospital conducted the second blood draw for independent medical purposes. However, the Commonwealth cannot argue that this blood draw was taken for both independent medical purposes and as a result of a "perceived duty" arising out of Section 3755. *See Shaw, supra* at 622–23, 298–99 (holding blood test taken for independent medical purpose is not same as blood test taken pursuant to Section 3755(a)). Further, the Commonwealth does not point to any additional evidence in the certified record supporting the claim that this blood test was taken due to hospital personnel's perceived duty arising out of Section 3755.

¶ 28 Additionally, the testimony from Officer Murphy and District Attorney Bell calls into question the hospital's motivations for even conducting a second blood draw. In light of all the evidence contained in the certified record, and absent some explicit reason for the medical neces-

sity of drawing blood from Appellant after his discharge, or any evidence suggesting the test was taken in conjunction with Section 3755(a), we cannot see how the Commonwealth met its burden of proof and persuasion. *See Wilmington, supra.*

¶ 29 However, the Commonwealth also contends, and we agree, that any erroneous admission of blood test results was "harmless error" in light of the properly admitted evidence of Appellant's guilt.

¶ 30 Instantly, Appellant admitted he had been driving the automobile when it crashed, causing the deaths of two people. The officer on the scene noticed that Appellant smelled of alcohol, had glassy eyes, was unsteady on his feet, and exhibited radical mood changes. Also, the results of the third blood draw taken at Allegheny General Hospital were properly admitted at trial. This blood draw revealed Appellant had a BAC of 0.106% at 5:50 a.m., which related back to a BAC of 0.130% at the time of the accident. Thus, we conclude the admission of the test results from the second blood draw taken at Indiana Hospital constituted harmless error. *See Drummond, supra.*

¶ 31 Based upon the foregoing, we hold the trial court properly admitted into evidence at trial the results of Appellant's blood test from Allegheny General Hospital, because this blood draw was conducted for independent medical purposes and the police obtained a properly executed search warrant before requesting the results. We also hold that the trial court should not have admitted the blood test results of Appellant's second blood test performed at Indiana Hospital, because there was no evidence in the certified record that the hospital performed this test for independent medical purposes or pursuant to the mandates of 75 Pa.C.S.A. § 3755. Nevertheless, we hold the erroneous admission at trial of the Indiana Hospital blood test

results constituted harmless error. Accordingly, we affirm.

¶ 32 Judgment of sentence affirmed.