J-S37021-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ISAIAH FREEMAN | : | |
| | : | |
| Appellant | : | No. 2364 EDA 2018 |

Appeal from the Judgment of Sentence Entered July 10, 2018
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0006135-2017

BEFORE:  SHOGAN, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY NICHOLS, J.:                **FILED DECEMBER 22, 2020**

Appellant Isaiah Freeman appeals from the judgment of sentence imposed after a jury convicted him of first-degree murder, conspiracy, two counts of aggravated assault, and possession of an instrument of crime.[1] Appellant argues that the trial court abused its discretion by finding that Appellant's sister violated the trial court's sequestration order and precluding her from testifying.  We affirm.

The trial court summarized the underlying facts of this matter as follows:

> On July 6, 2017, at approximately 6:30pm [Appellant] stalked and, as he admitted when he took the stand at trial, fatally shot 16-year old, Jordan Scott ("Scott,") [as Scott and his friend Taye Wynder ("Wynder")] walked along Chain Street toward Blackberry Alley in Norristown, Montgomery County.  Wynder was also shot but survived.  Minutes before the shooting, Appellant was the front

---

[1] 18 Pa.C.S. §§ 2502(a), 903(a)(1), 2702(a)(1), 2702(a)(4), and 907(a), respectively.

seat passenger in a dark grey 2013 Dodge Charger . . . owned and operated by Appellant's 30-year[-]old co-defendant, William Wilson ("Wilson" or co-[d]efendant). . . . While driving, Wilson caught sight of Scott and Wynder walking along the sidewalk. Wilson and [Appellant] decided that [Appellant] would shoot them.

\*　　\*　　\*

Seconds before the shooting . . . surveillance video captured Wilson parking his Charger surreptitiously along Blackberry Alley so that [Appellant], who Wilson had armed with a black handgun drawn from beneath his driver's seat, could exit the vehicle quickly without notice and ambush the two unsuspecting victims as they walked along Chain Street. [Appellant] can then be seen sneaking up to the corner, with a dark hoody drawn over his head to conceal his identity, jumping out from around the building's corner, and repeatedly firing . . . fatally wounding Scott . . . and seriously injuring Wynder[.]

When Norristown Police officers responded to 623 Chain Street minutes later, they located Scott lying on the sidewalk bleeding to death, with Wynder nearby having fled to safety to a rear yard west of Chain Street. Scott, [] was immediately transported to the hospital, [where he] was pronounced dead . . . .

Trial Ct. Op., 10/25/19, at 1-3 (footnotes omitted).

Before opening arguments, the Commonwealth made the following request:

[The Commonwealth]: Your Honor, the Commonwealth would be asking for a sequestration. I'm not sure if any of these individuals are under subpoena.

THE COURT: [Counsel]?

[Appellant's Trial Counsel]: I don't know that [*sic*], Judge. I have no objection to the gallery being asked that, if anybody has been subpoenaed, that they should wait outside.

THE COURT: Is there anybody here who has received a subpoena to testify? If so, please raise your hand or stand up.

Nobody is responding, so I guess there's no issue with sequestration.

Anything else before I bring the jury in? [Counsel]?

[Appellant's Trial Counsel]: One moment, Your Honor.

THE COURT: All right.

[Appellant's Trial Counsel]: We're ready, Judge.

THE COURT: Okay. Bring the jury in, please.

N.T. Trial, 4/17/18, at 131. Co-defendant's counsel did not object to the Commonwealth's request for the sequestration of witnesses. *Id.* Several times during the trial, co-defendant's counsel referred to sequestration being in effect. N.T. Trial, 4/18/18, at 90-91; N.T. Trial, 4/20/18, at 24-25.

Appellant testified in his own defense and he, in the words of the trial court, "present[ed] the jury with what can at best be characterized as a distorted imperfect self-defense; namely, that he preemptively hunted down Scott and Wynder to 'get them,' before they 'got him.'" Trial Ct. Op. at 4 (footnotes omitted).

We add that Appellant described how he and Scott used to be friends when they were in middle school, before Scott moved away. N.T. Trial, 4/20/18, at 209-12. On the date of the shooting, Appellant and his sister, Aniyah Evans ("Evans" or "sister"), were residing with their aunt after their mother kicked them out of her house. *Id.* at 213-14. Appellant further testified that on the day of the shooting, he had several phone calls with Evans. *Id.* at 242, 249-50; Ex. D-7. During those phone calls, Evans told Appellant that Scott and another man had come by their residence looking for

- 3 -

Appellant. N.T. Trial, 4/20/18, at 242-44. Appellant indicated that Evans was sitting in the courtroom during his testimony. *Id.* at 214, 242.

After Appellant finished testifying, the following exchange occurred:

THE COURT: Any additional evidence, [Counsel]?

[Appellant's Trial Counsel]: We have the sister's evidence.

[The Commonwealth]: Your Honor, I object. She's been sitting here the whole time. There was a sequestration order.

THE COURT: She was certainly sitting in during the testimony, and we did have a sequestration order, as far as I knew.

[Appellant's Trial Counsel]: Okay.

THE COURT: Any additional evidence?

[Appellant's Trial Counsel]: Your Honor, I would just move for my exhibits, and the defense would rest.

*Id.* at 317.

During closing arguments, Appellant's trial counsel argued that Appellant committed the shooting under serious provocation, and the jury should find Appellant guilty of voluntary manslaughter instead of first-degree or third-degree murder. N.T. Trial, 4/23/18, at 63-94.

On April 23, 2018, the jury convicted Appellant of first-degree murder, conspiracy, two counts of aggravated assault, and possession of an instrument of crime. Trial Ct. Op. at 5; *see also* N.T. Trial, 4/23/18, at 218-19.

The trial court sentenced Appellant to an aggregate term of lifetime imprisonment without the possibility of parole on July 10, 2018. *See* Trial Ct. Op. at 5-6. Appellant's trial counsel did not file any post-sentence motions.[2]

On August 8, 2018, Appellant filed a counseled timely notice of appeal. Appellant subsequently filed a timely court-ordered Pa.R.A.P. 1925(b) statement. On October 9, 2018, Appellant's trial counsel filed a petition to withdraw as counsel. The trial court granted the petition on November 14, 2018, and appointed new counsel to represent Appellant. The trial court issued a Rule 1925(a) opinion on December 19, 2018.

On March 29, 2019, Appellant filed an application for relief in this Court seeking a remand to the trial court for the filing of a supplemental Rule 1925(b) statement. We granted Appellant's request for a remand on April 16, 2019. Appellant timely filed his supplemental Rule 1925(b) statement on May 6, 2019. The trial court issued a supplemental Rule 1925(a) opinion on October 25, 2019.

Appellant raises a single issue on appeal:

Did the trial court err in preventing [Appellant] from presenting the testimony of his sister[, Aniyah Evans], where that testimony was admissible and proper?

---

[2] Appellant filed several untimely *pro se* post-sentence motions with the trial court. However, Appellant was still represented by counsel. Accordingly, Appellant's *pro se* filings constituted hybrid representation and were legal nullities. *See Commonwealth v. Nischan*, 928 A.2d 349, 355 (Pa. Super. 2007). These motions were sent to Appellant's trial counsel pursuant to Pa.R.Crim.P. 576(A)(4).

Appellant's Brief at 6. Appellant divides his claim into three sub-issues: (1) the trial court did not order the sequestration of witnesses; (2) even if the court ordered the sequestration of witnesses and Evans violated that order, excluding her testimony was too severe a sanction; and (3) the exclusion of Evans's testimony was not harmless. *Id.* at 15-21.

**The Trial Court's Sequestration Order**

First, Appellant contends that the trial court erred in finding Evans violated sequestration because the trial court never ordered that witnesses be sequestered. *Id.* at 17. According to Appellant, at the start of the trial, the trial court inquired if anyone in the gallery had received a subpoena, and when no one replied, the trial court instructed the jury to be brought in. *Id.* at 17-18 (citing N.T. Trial, 4/17/18, at 131). Appellant notes that the trial court did not give "a typical instruction to the gallery that anyone who might be a witness had to step outside." *Id.* at 18. Appellant argues that because the trial court never ordered sequestration, Evans was permitted to remain in the courtroom during the trial. *Id.* Appellant concludes the trial court committed an error of law by precluding Evans's testimony. *Id.*

The Commonwealth responds that the record is clear that trial court did order sequestration. Commonwealth's Brief at 14-16 (citing N.T. Trial, 4/17/18, at 131). The Commonwealth also argues that Appellant waived this issue because Appellant did not argue to the trial court that sequestration was not in effect. *Id.* at 16, 18 (citing N.T. Trial, 4/20/18, at 317).

This Court has previously held:

- 6 -

[o]ur Pennsylvania Rules of Appellate Procedure and our case law set forth the well-established requirements for preserving a claim for appellate review. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

***Commonwealth v. Phillips***, 141 A.3d 512, 522 (Pa. Super. 2016) (some citations omitted and some formatting altered); ***see also Commonwealth v. Smith***, 213 A.3d 307, 309 (Pa. Super. 2019) (stating "it is axiomatic that issues are preserved when objections are made timely to the error or offense." (citation omitted and some formatting altered)), *appeal denied*, 223 A.3d 1286 (Pa. 2020).

Here, Appellant did not claim that the sequestration was not in effect after the Commonwealth objected to Ms. Evans testifying on the grounds that she had violated sequestration. ***See*** N.T. Trial, 4/20/18, at 317. As set forth above, Appellant simply responded, "okay" and moved on. ***See id.*** Therefore, Appellant did not raise any argument that sequestration was not in effect during the trial and this claim is waived. ***See*** Appellant's Brief at 17 (arguing for first time on appeal that trial court never ordered sequestration of witnesses); Pa.R.A.P. 302(a); ***Smith***, 213 A.3d at 309; ***Phillips***, 141 A.3d at 522.

Even if Appellant had not waived this argument, the record establishes the trial court ordered sequestration of witnesses at the start of the trial. ***See*** N.T. Trial, 4/17/18, at 131; ***see also*** Trial Ct. Op. at 16. Furthermore, as we noted above, counsel for co-defendant referred to sequestration being in effect during the presentation of Commonwealth's evidence. ***See*** N.T. Trial,

4/18/18, at 90-91; N.T. Trial, 4/20/18, at 24-25. Therefore, even if Appellant had properly preserved his claim that the trial court never ordered sequestration, Appellant is not entitled to relief.

### Preservation of Appellant's Claim That the Trial Court Erred in Excluding Ms. Evans's Testimony

Appellant next argues that in response to the Commonwealth's objection, he did not have to make an offer of proof regarding his sister's proposed testimony because the substance of that testimony was clear from context. Appellant's Brief at 20-21. According to Appellant, because he had just testified about the phone conversation he had with his sister on the day of the shooting, it was clear to the Commonwealth and the trial court that Appellant was calling Evans to testify about that conversation. *Id.*

As stated above, the failure to raise a timely objection to an alleged trial court error waives that claim for appellate review. *See Smith*, 213 A.3d at 309; *Phillips*, 141 A.3d at 522. When the trial court ruled that Evans could not testify because she violated sequestration, Appellant's trial counsel simply responded "Okay." *See* N.T. Trial, 4/20/18, at 317. Appellant did not lodge any objection to the trial court's ruling excluding his witness. *See id.*; Pa.R.A.P. 302(a). As a result, Appellant has waived this claim but as we

explain below, his claim lacks substantive merit. *See Smith*, 213 A.3d at 309; *Phillips*, 141 A.3d at 522.[3]

### The Trial Court's Exclusion of Evans's Testimony

Appellant argues, in the alternative, that if the trial court had "properly ordered the sequestration of witnesses and Ms. Evans defied that order," the trial court violated Appellant's right to obtain witnesses in his favor by precluding Evans from testifying. Appellant's Brief at 18-19 (citing *Commonwealth v. Scott*, 436 A.2d 161, 163 (Pa. 1981)). Appellant claims that the trial court abused its discretion by precluding the witness instead of imposing a less severe sanction at its disposal, such as declaring a mistrial or allowing Evans to testify and issuing a cautionary instruction to the jury about the sequestration violation. *Id.* at 16, 19. Appellant contends that Evans's testimony would have corroborated his account of "the events which put him in the emotional state he was trying to prove in order to mitigate the case from murder to manslaughter." *Id.* at 19; *see also id.* at 21 (arguing "[Appellant] had every right to present a witness who could corroborate his story in order to convince the jury that this was a case of manslaughter, not

---

[3] Regardless, even if we construed "okay" as an objection, Rule of Evidence 103 requires a party to preserve a claim of error for the exclusion of evidence by informing "the court of its substance by an offer of proof, unless the substance is apparent from the context." *Commonwealth v. Pacheco*, 227 A.3d 358, 373 (Pa. Super. 2020). Appellant did not place an offer of proof on the record after the Commonwealth objected to his sister testifying. *See* N.T. Trial, 4/20/18, at 317. In any event, as we explain below, the trial court did not err in excluding Evans's testimony.

murder" and "Ms. Evans is the only one who could confirm when those conversations happened.").

The Commonwealth responds that preclusion of a defense witness's testimony is a permissible sanction for a witness's violation of a sequestration order when a defendant or defense counsel cooperated in the violation. Commonwealth's Brief at 19-20 (citing *Scott*, 436 A.2d at 163). According to the Commonwealth, Appellant's trial counsel was aware that Evans was present in the courtroom while Appellant was testifying. *Id.* at 20 (citing N.T. Trial, 4/20/18, at 242). The Commonwealth argues that because Appellant and his counsel were "at fault for, and complicit in, the sequestration violation[]" the trial court did not abuse its discretion in excluding Evans as a witness. *Id.*

> This Court has explained:
>
> [i]t is well established in this Commonwealth that the decision to admit or to exclude evidence lies within the sound discretion of the trial court. Moreover, our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Commonwealth v. Robertson*, 874 A.2d 1200, 1209 (Pa. Super. 2005) (citations and some formatting omitted).

The *Robertson* Court explained when a trial court finds that a sequestration order has been violated:

> [t]he selection of a remedy for the violation . . . is within the discretion of the trial court. However, to deny a criminal

- 10 -

> defendant the opportunity to present relevant and competent evidence in his defense would constitute a violation of his fundamental constitutional rights to compulsory process for obtaining witnesses in his favor and to a fair trial. ***Commonwealth v. Scott***, 496 Pa. 78, 436 A.2d 161, 163 (1981). . . . Absent a showing of fault on the part of the party or counsel who called a witness, an exclusion of a criminal defendant's witness' testimony solely because the witness violated a sequestration order is an abuse of discretion. ***Scott***, 436 A.2d at 163.

***Id.*** at 1209-10 (some citations omitted). In ***Robertson***, the defendant's trial counsel explained that that the witness's violation of the sequestration order was inadvertent. ***Id.*** at 1210. The ***Robertson*** Court concluded it was not appropriate to exclude the witness's testimony on the basis of the violation of the sequestration order, but the trial court properly excluded the witness's proposed testimony as inadmissible hearsay. ***Id.*** at 1210-11.

Here, based on our review of the record, the parties' briefs, and the well-reasoned opinion of the trial court, we discern no abuse of discretion or error of law by the trial court in excluding Evans's testimony. ***See*** Trial Ct. Op. at 17-18; ***Robertson***, 874 A.2d at 1209-10; ***see also Scott***, 436 A.2d at 163. Therefore, even if Appellant had properly preserved this claim, Appellant is not entitled to relief. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2020

# IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :        NO. 6135-17
                            :        2364 EDA 2018

            v.               :

ISAIAH FREEMAN            :

## SUPPLEMENTAL OPINION

Branca, J.                                        October 25, 2019

## I.    INTRODUCTION

Isaiah Freeman ("Defendant" or "Freeman") appeals to the Superior Court from the

sentence imposed by this Court on July 10, 2018, by virtue of the jury's verdict of Guilty

rendered on April 23, 2018. For the reasons that follow, Defendant's appeal is without merit.

## II.    STATEMENT OF THE CASE

### A.    Factual History

On July 6, 2017, at approximately 6:30pm Defendant stalked and, as he admitted when

he took the stand at trial, fatally shot 16-year old, Jordan Scott ("Scott,") and his juvenile friend

Taye Wynder ("Wynder,") as the boys walked along Chain Street toward Blackberry Alley in

Norristown, Montgomery County.[1] Wynder was also shot but survived. Minutes before the

shooting, Defendant was the front seat passenger in a dark grey 2013 Dodge Charger (PA

registration KKG-5913) owned and operated by Defendant's 30-years old co-Defendant,

William Wilson ("Wilson" or co-Defendant). They were accompanied by another juvenile

identified herein as B.B. in the backseat. While driving, Wilson caught sight of Scott and

---

[1] [N.T. 4/20/18, at 254-55 ("I ran to where they were going to come from . . . . when they was getting closer, I jumped out, and I shot in their direction.") at 259 ("I knew I was guilty.")].

1

Wynder walking along the sidewalk. Wilson and Freeman decided that Freeman would shoot them.

By way of background, Defendant's attack on Scott and Wynder arose out of an escalating feud between what the parties called the "the Norristown boys" of which Defendant and co-Defendant Wilson were members and another faction, "the Pottstown boys" of which Scott and Wynder were members. That feud began a few days earlier on July 1, 2017, with a fist fight between two juveniles members of each respective group; Elijah Jones (Norristown boys) and Jamir Harris (Pottstown boys).[2] The derisive division was further exacerbated by a shooting which occurred on July 5, 2017, at approximately 12:40am, when multiple witnesses reported hearing shots ring out near the corner of Green and Marshall Streets in Norristown. Evidence at trial suggested that Scott received a single non-lethal gunshot wound in that July 5th incident which Scott believed was at the hands of Defendant as the shooter. Additionally, the Commonwealth presented evidence of a Facebook call to Defendant wherein Scott bragged that he was still alive, and Defendant retorted that he was going to kill Scott.

Seconds before the shooting the very next day, on July 6th, surveillance video captured Wilson parking his Charger surreptitiously along Blackberry Alley so that Defendant, who Wilson had armed with a black handgun drawn from beneath his driver's seat, could exit the vehicle quickly without notice and ambush the two unsuspecting victims as they walked along Chain Street.[3] Defendant can then be seen sneaking up to the corner, with a dark hoody drawn over his head to conceal his identity, jumping out from around the building's corner, and repeatedly firing the black handgun Wilson handed him in the car minutes before, fatally wounding Scott, as he had vowed to do on Facebook, and seriously injuring Wynder

---

[2] [N.T. 4/20/18, at 220-22].
[3] [N.T. 4/19/18, at 247-67].

2

When Norristown Police officers responded to 623 Chain Street minutes later, they located Scott lying on the sidewalk bleeding to death, with Wynder nearby having fled to safety in a rear yard west of Chain Street. Scott, who was immediately transported to the hospital, was pronounced dead at 7:28pm. The investigation conducted by police resulted in the issuance of an arrest warrant for Defendant for First Degree Murder, Criminal Conspiracy to Commit First Degree Murder, and related offenses. On August 30, 2017, U.S. Marshals located and apprehended Defendant at 5506 North 3rd Street in Philadelphia.[4] At trial, the Commonwealth presented overwhelming credible evidence to support Defendant's conviction, including but not limited to the aforesaid Facebook call where Defendant vowed to kill Scott, seamless surveillance footage capturing the entirety of the episode leading up to the shooting, the shooting, as well as Defendants' fleeing from the scene in the Dodge Charger and the testimony of the other passenger in Wilson's car, B.B., who related that Defendant took the black handgun Wilson provided him, ambushed Scott and Wynder, firing approximately six( 6) shots, raced back to Wilson's car, and in response to Wilson's inquiry if he had shot them, gestured excitedly waving his hand about his chest, saying he "got" Scott "all in here."[5] As damning as that evidence was, most damning was Defendant's testimony at trial.

Despite the Court's repeated admonition to the jury and Defendant that defendants have no obligation to testify and any such decision cannot be held against them, Defendant took the stand.[6] The first part of Defendant's testimony was dedicated to rebutting the testimony of the Commonwealth's final witness, Detective Gregory Henry ("Det. Henry") of the Montgomery County Detective Bureau. The sole purpose for which the Commonwealth called Det. Henry

N.T. 3/22/18, at 149, Ex. CS-10 ("Montgomery County Detectives Homicide Supplemental Report")]....
N.T. 4/19/18, at 247- 68 (referencing the black Cobra FS380 Model pistol)]; [N.T, 4/18/18, at 35-147]....
[N.T. 4/20/18, at 202-203]. ].

3

was to recount his personal in-court observations of Defendant from earlier that day. Det. Henry testified that, during a break in the trial and outside of the presence of the jury, defense counsel, and the undersigned, he observed Defendant gesturing and signaling (with his finger up to his mouth) to the Commonwealth's witness, Nathaniel Howard, seated on the witness stand preparing to testify, to keep his mouth shut.[7] Det. Henry testified as follows:

> I saw Mr. Howard's attention draw to his left towards the defense table, which caused me to look over that way. At that point, I saw the defendant, Mr. Freeman, lean forward and go (indicating). And then he mouthed, don't say anything, by turning his head slightly, like don't say anything.[8]

As such, when Defendant took the stand he preliminarily attempted to rationalize and account for the intimidating gestures that Det. Henry had caught him making to silence the Commonwealth's witness; with the dubious explanation that he was merely pointing his finger up, admittedly "near . . . [his] . . . mouth" to indicate that he anticipated seeing the witness "up top" or "upstate;" in state prison.[9] In addition, Defendant used his time on the stand to present the jury with what can at best be characterized as a distorted imperfect self-defense; namely, that he preemptively hunted down Scott and Wynder to 'get them,' before they 'got him.'[10] Despite his attempts, and it light of its verdict, the jury obviously did not accept Defendant's strained attempt at justification; a finding wholly within its province, and clearly within the evidence.

## B.    Procedural History

The Commonwealth ultimately charged Defendant with the following on Bill of Information 6135-17: Count One (First Degree Murder of Jordan Scott,) Count Two (Criminal Conspiracy to Commit First Degree Murder of Wynder,) Count Three (Third Degree Murder of Jordan Scott,) Count Four (Criminal Conspiracy to Commit First Degree Murder of Jordan Scott

---

[7] [N.T. 4/20/18, at 195-99].
[8] [N.T. 4/20/18, at 198].
[9] [N.T. 4/20/18, at 206-207].
[10] [N.T. 4/20/18, at 239-61, at 252 ("I believe they was going to come and get me.")].

4

and/or Wynder,) Count Five (Criminal Attempt to Commit First Degree Murder of Wynder,) Count Six (Aggravated Assault of Wynder,) Count Seven (Aggravated Assault of T. W.,) and Count Eight (Unlawful Possession of a Firearm).[11]

Thereafter, the Commonwealth moved and was granted leave to consolidate Defendant's case with that of his co-Defendant, William Wilson (6125-17); in response to which Defendant filed a Motion to Sever, which the Court denied by Order dated April 12, 2018.[12] In addition, the Commonwealth filed a Motion to Admit Defendant's Prior Bad Acts, which the Court granted, as uncontested.[13] The disposition of both Motions forms a significant part of the basis of Defendant's instant appeal, as addressed hereinafter.

On April 16, 2018, the case proceeded to a 6-day trial after which the jury found Defendant guilty of Counts: One (First Degree Murder of Jordan Scott,) Two (Criminal Conspiracy to Commit First Degree Murder of Wynder,) Six (Aggravated Assault of Wynder,) Seven (Aggravated Assault of Wynder,) and Eight (Unlawful Possession of a Firearm).[14]

On July 10, 2018, after reviewing the Presentence Investigation report, the undersigned conducted a sentencing hearing at which it heard testimony from Jordan Scott's mother, Denise Scott; and, Darren Evans, who characterized himself as Defendant's "uncle/father," and stood spontaneously at sentencing requesting permission to speak on Defendant's behalf.[15] Defendant declined to exercise his right of allocution.[16] In accordance with the applicable mandatory sentencing scheme, the Court sentenced Defendant as follows: on Counts One (First Degree

---

[11] 18 Pa. C.S. §§ 2502(a); 903(a)(1), 2502(c), 903(a)(1), 901(a), 2702(a)(1), 2702(a)(4), and 907(a).
[12] [Order, dated 4/12/18, (4/13/18)].
[13] [Order, (3/20/18)].
[14] By virtue of its verdict on Counts One (First Degree Murder of Jordan Scott) and Two (Criminal Conspiracy to Commit First Degree Murder of Wynder,) the jury was precluded by law from rendering verdicts on either Counts Three (Third Degree Murder of Jordan Scott) or Four (Criminal Conspiracy to Commit First Degree Murder of Jordan Scott and/or Wynder); and it found Defendant not guilty of Count Five (Criminal Attempt to Commit First Degree Murder of Wynder). [N.T. 4/23/18, at 218-19]; [Disposition (4/23/18)].
[15] [N.T. 7/10/18, at 4-9, 12-18].
[16] [N.T. 7/10/18, at 10].

Murder of Jordan Scott) and Two (Criminal Conspiracy to Commit First Degree Murder of Wynder,) concurrent terms of lifetime imprisonment without the possibility of parole, Count Six (Aggravated Assault of Wynder,) imprisonment of not less than four (4) years, nor more than eight (8) years, to run concurrent to Counts One and Two, followed by ten (10) years of consecutive probation, Count Seven (Aggravated Assault of Wynder,) imprisonment of not less than sixteen (16) months, nor more than thirty-two (32) months, to run concurrent to Count Six, followed by six (6) years of consecutive probation, and Count Eight (Unlawful Possession of a Firearm,) imprisonment of one (1) to five (5) years, to run concurrently to all other counts. After informing Defendant of his full panoply of post-sentence and appellate rights, the Court addressed and denied Defendant's request for the appointment of new counsel which came to light during the hearing.[17] Mindful of the applicable imperative temporal parameters, the Court ordered previously appointed trial counsel to continue his representation of Defendant, to "file any post-sentence motions that . . . [he] . . . deem[ed] appropriate, and file the appeal so as not to jeopardize any of the Defendant's appellate rights;" with the caveat that counsel could move to withdraw thereafter.[18] The record reflects Defendant filed several pro se documents after sentencing and appeal which the Court deems nullities.[19]

On August 8, 2018, Defendant timely filed, and served upon the undersigned, a Notice of Appeal challenging the imposition of his sentence. In response to the Court's request, and pursuant to Pa. R.A.P. 1925(b), Defendant timely filed and served a Concise Statement of

---

[17] [N.T. 7/10/18, at 26, 12]; [Post Sentencing Procedures (7/12/18)].

[18] [N.T. 7/10/18, at 28]. Upon trial counsel's withdraw, the undersigned appointed appellate counsel to represent Defendant by Order dated November 14, 2018. [Order, (11/16/18)].

[19] *See Commonwealth v. Faulk*, 21 A.3d 1196, 1202 (Pa. Super. Ct. 2011) (No constitutional right to hybrid representation exists.) (internal citation omitted). Moreover, while the Court is aware of Defendant's pro se post-sentence motion, filed on July 27, 2018, asserting that the Commonwealth committed a *Brady* violation with regard to the alleged "downloaded contents," no indication of when Defendant mailed it is readily apparent, and thus, the 'prisoner mailbox' rule is not feasible; and, as discussed *infra*, is meritless in any event.

6

Matters Complained on Appeal ("1925(b) Statement").[20] Thereafter, this Court submitted an

Opinion. On April 16, 2019, however, upon consideration of Defendant's Petition For Remand,

the Superior Court remanded the record, directing Defendant to file a supplemental 1925(b)

Statement, and this Court to file a supplemental opinion.

## III. ISSUES PRESENTED

Defendant's Supplemental 1925(b) Statement asserts the following issues for review: [21]

1. Did the trial court err in denying Mr. Freeman's Motion for Severance?

2. Did the trial court err in denying Mr. Freeman's Motion to Suppress regarding Mr. Freeman's statements made to police?

3. Did the trial court err in permitting the jury to hear redacted statements from Mr. Freeman's co-defendant, when Mr. Freeman could not cross-examine the co-defendant?

4. Did the trial court err in denying Mr. Freeman's Motion to Suppress regarding the search of 5505 North Third Street Norristown, PA?

5. Did the trial court err in preventing Defendant from calling his sister as a witness?

6. Did the Commonwealth violate its duty pursuant to *Brady v. Maryland* by refusing to disclose the contents of Bryce Byrd's phone records?

## IV. DISCUSSION

The standard of review applied to claims raised on appeal is limited to determining

whether the trial court abused its discretion or committed an error of law. *See Commonwealth v.*

*West*, 937 A.2d 516, 521 (Pa. Super. Ct. 2007); Pa. R. Crim. P. 720. In evaluating a trial court's

decision, an "abuse of discretion may not be found merely because an appellate court might have

reached a different conclusion, but requires a result of manifest unreasonableness, or partiality,

---

[20] [Def.'s 1925(b) Statement, (9/10/18)] (Asserting that the trial court erred in denying appellant's Motion for Severance based on *Bruton* and its progeny, and, in granting the Commonwealth's Motion to Admit Prior Bad Act Evidence, where the probative value of the evidence was outweighed by its unfair prejudicial impact under Pa. R.Crim.P. 404(b)).
[21] [Def.'s Supp. 1925(b) (5/6/19)].

7

prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth*

*v. Greer*, 951 A.2d 346, 355 (Pa. 2008) (internal quotation omitted).

## A. The Court Properly Denied Defendant's Motion To Sever & Admitted Co-Defendant Wilson's Redacted Statement.

On appeal, Defendant asserts that the Court erred both in denying his Motion to Sever

based on *Bruton* and its progeny, and concomitantly in admitting Wilson's redacted statement.[22]

Contrary to Defendant's assertions, the Court took great care to ensure that Wilson's statements

were, with counsels' input, and consistent with applicable legal authority, effectively redacted to

eliminate any indicia of Defendant's identity as participant; thereby nullifying any potential for

impermissible prejudice. As such, Defendant's instant claims fail.[23]

Given the inextricably intertwined nature of the underlying criminal episode and related

charges, including conspiracy, as well as the overlapping documentary, audiovisual, and

testimonial evidence supporting Defendants' criminal culpability, the Court granted the

Commonwealth's pretrial request for consolidation.[24] In response, Defendant moved for

severance on the basis that the Court's anticipated admission of Wilson's statement, implicating

Defendant, would violate Defendant's 6th Amendment right under the Confrontation Clause.

After careful consideration and redaction of Wilson's statements, the Court denied Defendant's

Motion. At trial, consistent with the Court's pretrial disposition of Defendant's Motion to Sever,

the Commonwealth introduced several redacted statements made by co-Defendant, Wilson.[25] On

the whole, the Commonwealth's redactions substituted the noun "guy," or a masculine pronoun,

---

[22] [*See* Def.'s Supp. 1925(b), at ¶¶ 1,3 (5/6/19)]. The *Bruton* rule is not violated by the introduction, at a joint trial, of a co-defendant's confession, redacted to remove any reference to particular defendant. *Commonwealth v. Johnson*, 378 A.2d 859 (Pa. 1977).

[23] [Order, attaching Ex. B ("Final Reacted Statement" (4/13/18))].

[24] *See Commonwealth v. Brown*, 925 A.2d 147, 161 (Pa. 2007) ("When conspiracy is charged, a joint trial generally is advisable.")

[25] [N.T. 4/18/18, at 228-48, Ex. C-44 ("Statement of W. Wilson"); at 248, Ex. C-45 ("Police report dated 7/26/17)]; [N.T. 4/19/18, at 26-28, Ex. C-49 ("Unsigned statement of W. Wilson); at 42-43, Ex. C-50 ("Signed statement of W. Wilson")].

8

for Defendant's name; redactions particularly non-prejudicial to Defendant considering the undisputed physical presence of another male passenger (B.B.) in Wilson's vehicle. Moreover, while Wilson's redacted statements were read to the jury, they were never visually or physically published to the jury such that it would observe that they had, in fact, been redacted specifically and narrowly to remove only certain identifying words.

In *Commonwealth v. Travers*, the Pennsylvania Supreme Court held that the trial court's admission of co-defendant's confession, redacted to replace direct references to defendant with the words "the other man," coupled with appropriate cautionary instructions, sufficiently protected defendant's 6th Amendment confrontation clause rights. *Commonwealth v. Travers*, 768 A.2d 845 (Pa. 2001). In reaching its decision, the Court noted as follows:

> The decision of whether to sever trials of co-defendants is within the sound discretion of the trial court. Both this Court and the United States Supreme Court have recognized that joint trials of co-defendants play a crucial role in the criminal justice system.
> . . .
> It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability.

*Id.* at 846-47 (internal citations omitted). "[E]ven were the confession the very first item introduced at trial," the Court opined the vagary and generality of the phrase "other man" was certainly not of the sort which obviously referred to the defendant so as to inform the jury of the redaction. *Id.* at 851 (internal citations omitted). Significantly, in upholding the trial court's evidentiary admission, the *Travers* Court determined that co-defendant's redacted statement had only become incriminating through the introduction of other independent evidence at trial which

9

established defendant's culpability; and even then, defendant could only be prejudiced if it is assumed that the jury ignored the court's explicit cautionary instructions. *Id.* at 851. The Court, thus, concluded that, "[i]n light of the governing principles in this area, . . . the redaction here, combined with the trial court's accurate and repeated cautionary charge, sufficed to protect appellant's Sixth Amendment right to confrontation." *Id.; see also, Commonwealth v. Cannon,* 22 A.3d 210 (Pa. 2011); *Commonwealth v. James,* 66 A.3d 771 (Pa. Super. Ct. 2013); *Commonwealth v. Whitaker,* 878 A.2d 914 (Pa. Super. Ct. 2005).

In this case, any potential for impermissible prejudice to Defendant was ameliorated, particularly as noted given the undisputed physical presence of two male passengers in the car, by redaction of co-Defendant Wilson's statements with varying innocuous, anonymous terminology, including "guy," "the guy," "this guy," "the other guy," "him," and "he." *See Travers,* 768 A.2d 851 (Pa. 2001) (Holding that substituting the neutral phrase "the guy" or "the other guy" for defendant's name is an appropriate ameliorative redaction); *see also Commonwealth v. McGlone,* 716 A.2d 1280 (Pa. Super. Ct. 1998) ("The powerfully incriminating nature of an obvious and glaring 'hole' in the statement simply is not present when a generic term like 'other man' is used."). In addition, in this case, the implications, import, and impact of intertwining indicia of other related criminal conduct cannot be understated. For the majority of statements provided by Defendant and his co-defendant were obfuscated in their original form by their vague and/or anonymous references to a variety of unnamed or nicknamed participants; such that substitution of the word "guy" for Defendant's name did not stand out as an alteration.

Moreover, contrary to Defendant's assertion, the statements in this case were carefully redacted so as not to alert the jury to any alteration. As such, the cases relied upon by Defendant

10

in support of severance are distinguishable. *See e.g., Commonwealth v. Markman*, 916 A.2d 586, 600 (Pa. 2007) (*Bruton* violated when jury was permitted to hear co-defendant's obviously redacted audiotaped confession, dubbing over defendant's name with the phrase "the other person" in a distinct voice, and court further compounded error by affirmatively informing jury tape had been so altered.); *Commonwealth v. Oliver*, 635 A.2d 1042 (Pa. Super. Ct. 1993) (*Bruton* violated where demands of judicial economy and verdict consistency did not outweigh prejudice to defendant, tried jointly with three co-defendants and error not harmless where properly admitted evidence could have been enough to sustain guilty verdict against defendant, in absence of admission of co-defendant's confession.); *Commonwealth v. Gray*, 523 U.S. 185 (1998) (*Bruton* violated when jury was aware confession had been redacted in that a blank space and the word "deleted" were substituted for defendant's name.)

Furthermore, as in *Travers*, the careful nature of the redactions coupled with the ample prophylactic guidance provided by the Court throughout the trial, as well as part of its concluding instructions sufficed to protect Defendant's 6th Amendment rights, and any impermissible prejudice to Defendant was outweighed by the benefits, addressed previously, accompanied by a joint trial. *See Commonwealth v. Jones*, 668 A.2d 491, 501-502 (Pa. Super. Ct. 1995) (Holding that court's cautionary instructions cured prejudice to defendant allegedly attributable to admission of co-defendant's confession.)

During the Commonwealth's case-in-chief, and before its introduction and admission of co-Defendant Wilson's statement, the Court peremptorily gave the jury the following cautionary instruction: [26]

---

[26] [N.T. 4/18/18, at 208-209].

THE COURT: Ladies and gentlemen, you're about to hear from Detective Richard that the Commonwealth is going to introduce evidence of statements that were made by Defendant Wilson.

. . .

There is also a further rule that restricts use by you of the evidence offered to show that Defendant Wilson made statements concerning the crimes that were charged. A statement purportedly made before trial by Defendant Wilson may . . . be considered only as evidence against Defendant Wilson who made the statement.

. . .

You must not, however, consider the statement as evidence against Defendant Freeman. You must not use the statement in any way against Defendant Freeman.

Likewise, at close of all of the evidence, the Court again reminded the jury of the limited purpose for which co-Defendant Wilson's earlier statements could be used with the following cautionary instructions; eliminating any potential for unfair prejudice:[27]

THE COURT: Now, there is a further rule that restricts use by you of the evidence offered to show that a Defendant made the statement concerning the crime charged. Generally, a statement made before trial may be considered as evidence only against the Defendant who made that statement. Thus, you may consider the statement as evidence against that Defendant, who made it, if you believe he made the statement voluntarily. You must not, however, consider the statement as evidence against the other Defendant. I'm going to clarify that a little bit in this case.

You must not use the statement in any way against the other Defendant. So, in this case, in short, you cannot consider any statements purportedly made by Wilson against Freeman. However, as Defendant Freeman testified, you can consider his pretrial statement, as well as his trial testimony, not only against him, but against Wilson. Subject, of course, to your determination as to its credibility and his credibility on the stand.

Notably, as in *Travers*, *supra*, Wilson's statement only became incriminating of Defendant through the introduction of other independent and devastating evidence that

---

[27] [N.T. 4/23/18, at 146].

12

Defendant was the shooter including of course the video of the entire shooting episode and Defendant's own admission that he was the shooter captured in the video surveillance.

In the final analysis, even if the admission of Wilson's statement was error, the fact that Defendant took the stand and admitted that he shot Scott and Wynder as depicted in the video surveillance which captured Defendant armed, stalking Scott and Wynder, jumping out, and shooting both of them, renders any alleged prejudice harmless. It is well-settled that not all alleged errors at trial entitle a defendant to a new trial, and instead, Pennsylvania's harmless error doctrine reflects the reality that an accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. West*, 834 A.2d 625, 634 (Pa. Super. Ct. 2003). An error is harmless where:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis;* or
> (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or
> (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict."

*Commonwealth v. Passmore*, 857 A.2d 697, 711 (Pa. 2004).

Given Defendant's own admissions on the stand, and the overwhelming evidence presented by the Commonwealth, the Court's decision denying severance, was unquestionably harmless.

## B. The Court Properly Denied Defendant's Motion To Suppress.

Next, Defendant claims that the Court erred in denying his Motion to suppress statements he made to police, as well as the related search of 5506 North Third Street.[28] As addressed hereinafter, Defendant's instant claims are unavailing.

---

[28] While Defendant's Supplemental 1925(b) Statement references "5506 North Third Street Norristown, PA," the Court takes judicial notice that the address at issue is located in Philadelphia.

13

Initially, the Court's April 12, 2018 Order, denying Defendant's Motion to Suppress, and its Findings of Fact and Conclusions of Law are attached hereto.[29] In claiming his statements were entitled to suppression, Defendant argued that his Miranda waiver was not knowing, intelligent, and voluntary. Contrary to his contention and as delineated at length in the Court's April 12, 2018 Order, Findings of Fact and Conclusions of Law, the record aptly demonstrates that police properly advised Defendant of all of his attendant Constitutional rights and he thereafter memorialized his knowing, voluntary, and intelligent waiver of those rights by executing the waiver form, as witnessed by Det. Crescitelli.[30] Likewise, Defendant's claim that the Court erred in denying suppression of the 5506 North Third Street search is equally unavailing. The record reflects that he abandoned his pursuit of that claim at the time of the suppression hearing, and it is thus deemed waived:[31]

The Commonwealth: Your Honor, before we begin with the suppression motions for defendant Freeman, I just want to be clear. The only thing that Mr. McMahon [Defense Counsel] is contesting is the statement - - Miranda on the statement.

Mr. McMahon: Right.

The Commonwealth: Ok. So you're not going to be contesting the call detail records or the searches or any of that stuff?

Mr. McMahon: No. Just the statements.

As such, and in light of the totality of the circumstances surrounding Defendant's Miranda waiver, the Court's denial of Defendant's Motion was appropriate.

---

[29] *See* Pa. R.A.P. 1925(b)(a)(1)("[U]pon receipt of the notice of appeal, the judge who entered the order giving rise to the notice of appeal . . . shall specify in writing the place in the record where such reasons may be found."); [*see* Order, Findings of Fact & Conclusions of Law (4/13/18)].

[30] [N.T. 3/22/18, at 156-57, at Ex. CS-10 ("Montgomery County Detectives Homicide Supplemental Report,") at p. 5 of 5].
[31] [N.T. 3/22/18, at 148].

14

**C. Defendant Failed To Preserve Any Claim As To Ms. Evans, And In Any Event, Such A Claim Is Substantively Unavailing.**

Next, Defendant asserts that the Court erred "in preventing Defendant from calling his sister (Iniyah Evans) as a witness."[32] Having failed to properly preserve this claim at trial, it is deemed waived. Moreover, the Court, in any event, properly precluded Defendant's sister from testifying as both Defendant and Defense Counsel were aware of her presence throughout the trial despite the sequestration order and the defense did not proffer any evidence or explanation that her presence was inadvertent. *Compare, Commonwealth v. Robertson*, 874 a.2d 1200 (Pa. Super. Ct. 2005) (Witness permitted to testify where defense asserted, and the Commonwealth did not dispute, that sequestration violation was inadvertent.)

Finally, any alleged harm resulting therefrom was either nonexistent or de minimis, in light of the Court's admission of Defendant's testimony that he was provoked by his sister's call and the Court's provision of voluntary manslaughter instructions to the jury. As such Defendant's claim merits no relief.

Initially, Defendant failed to pursue, and thus, preserve a claim as to preclusion of his sister, Ms. Iniyah Evans as a witness, as he abandoned his request upon the Commonwealth's objection. *See* Pa. R.A.P. 1925(b)(4). To preserve an evidentiary claim, a party must make a timely objection. Pa. R.E. 103(a). More specifically, "[a] party may claim error in a ruling to admit or exclude evidence only if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Pa. R.E. 103(a)(2). Moreover, it is well-settled that "issues, even those of constitutional dimension, are waived if not raised in the trial court. A new and different theory of relief may not be successfully advanced for the first time on appeal." *Commonwealth v. Cline*, 177 A.3d 922, 927

---

[32] [Def.'s Supp. 1925(b), at ¶ 5 (5/6/19)].

15

(Pa. Super. Ct. 2017) *appeal denied*, 187 A.3d 210 (Pa. 2018) (internal citations omitted); *see* Pa.

R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first

time on appeal").

Before trial commenced in this case, the Commonwealth requested sequestration and

there was no objection. Then, after Defendant concluded his testimony, the underlying exchange

occurred:[33]

| The Court: | Any additional evidence, Mr. McMahon? |
|---|---|
| Mr. McMahon: | We have the sister's evidence. |
| The Commonwealth: | Your Honor, I object. She's been sitting here the whole time. There was a sequestration order. |
| The Court: | She was certainly sitting in during the testimony, and we did have a sequestration order, as far as I know. |
| Mr. McMahon: | Okay. |
| The Court: | Any additional evidence? |
| Mr. McMahon: | Your Honor, I would just move for my exhibits, and the defense would rest. |

As demonstrated, upon objection by the Commonwealth, Defense Counsel readily

acknowledged that in light of the sequestration order, Ms. Evans's presence throughout the trial

precluded her from testifying; thereby abandoning his request that she take the stand.

Similarly, having failed to make any offer of proof so as to preserve the instant claim,

Defendant abandoned pursuit of his sister's testimony. Likewise, at the conclusion of the trial,

Defense Counsel again acknowledged the preclusive import of the sequestration order, and

affirmed his prior abandonment of his request for her to take the stand, as follows:[34]

---

[33] [N.T. 4/20/18, at 317].
[34] [N.T. 4/23/18, at 20-25] (emphasis added).

16

| Mr. McMahon: | Judge, just one other thing, I had submitted Defendant's Motions in Limine relative to the prosecution's closing statement. I don't know if you had a chance -- |
| | . . . |
| | Two things, Judge. . . . Okay. Second one. Judge, the defense attempted to call Ayeda (ph) Evans in its case, the Commonwealth objected, based on a violation of sequestration. **I understand that.** |
| | Nonetheless, I do not think it would be appropriate and proper for the Commonwealth -- and I'm not saying Ms. Cauffman would do this, but this is all in an abundance of caution -- to get up and argue something to the effect that the defense never called Ms. Evans, Mr. Freeman's testimony was not corroborated by his sister. In some way pointing that out, which under normal circumstances, might be appropriate. But she was precluded from testifying over the Commonwealth's objection. So I don't think that they can object to the witness testifying and then hail the defense by saying, well, they didn't call her. |
| The Commonwealth: | I'm not going to do that. |
| The Court: | I didn't think so. Anything else? |
| Mr. McMahon: | No. |

As demonstrated above, Defense Counsel affirmatively acknowledged that the sequestration order barred Ms. Evans from testifying based on her presence in the courtroom throughout the entirety of the trial up to that point, and thereby waived any alleged evidentiary error arising therefrom.

In any event, if not waived, the Court was correct in precluding her testimony. Absent a showing of fault on the party calling the witness, the trial court should not disqualify a witness for a sequestration violation. A witness should, however, be disqualified when his sequestration violation occurs with "the consent, connivance, procurement or **knowledge of the (accused) or his counsel**." *See Commonwealth v. Scott*, 436 A.2d 161, 163 (Pa. 1981) (internal citations omitted) (emphasis added). Here, no evidence or explanation was put forth that Ms. Evans's

17

presence was inadvertent, and to the contrary, both Defendant and Defense Counsel were well aware of her presence, as was the Court. Defense acknowledged as much by conceding to the Commonwealth's objection that Ms. Evans had been present 'the whole time.' Defendant and Defense Counsel having known of Ms. Evans's presence in the courtroom throughout the trial, despite the sequestration order, the Court properly precluded her testimony as her unexplained presence is deemed not to be inadvertent. *See Scott, supra.*

Finally, even if Defendant had properly preserved his instant claim, he is entitled to no relief. Defendant's bald assertion that the Court erred in 'preventing' Ms. Evans from testifying neglects to articulate the manner in which the proffered testimony would have altered the case's outcome. In the absence of such clarification and/or a contemporaneous offer of proof, the testimony sought to be elicited from Ms. Evans was irrelevant. *See* Pa. R.E. 401. For while not explicitly stated, as far as can be gleaned from the record, Defendant's instant claim specifically relates to his claim that he was provoked by his victims and acted under a heat of passion, such that the evidence required that the Court charge the jury on voluntary manslaughter.[35] Given the objective evidence of record, however, which unequivocally negated Defendant's claim that his sister's had called him *the day of* the murder, and that call had incited and provoked him, any potentially corroborative testimony by Ms. Evans could not have rendered Defendant's provocation claim anymore (or less) probable.[36] *See* Pa. R.E. 401(a). Instead, the call records admitted by the Commonwealth confirmed that the call Defendant received from his sister, Ms. Evans, and which he asserted had provoked him, actually occurred at 10:36pm *the night before*

---

[35] Even if Ms. Evans had been permitted to take the stand, while completely hypothetically in light of Defendant's failure to make the requisite offer of proof, any claim that her testimony may have altered the landscape of this trial to the extent it might have mitigated the severity of the jury's verdict is completely unsupported; especially, because the objective evidence of record expressly contradicted Defendant's claim that Ms. Evans called him on the day of the murder, which presumably is what he sought to elicit from her. *See* Pa. R.E. 615.

[36] [N.T. 4/20/18, at 248, 317, Ex. D-7 (Phone Records of I. Freeman)]; [4/23/18, at 118, Ex. D- 7].

18

the murder; some twenty (20) hours before video surveillance captured Defendant gunning down his victims. [37] More specifically, and as summarized below in the Commonwealth's closing argument, the objective evidence rendered any attempted corroboration by Ms. Evans impracticable:[38]

The Commonwealth: And counsel talked about provocation. And he really, really went into that provocation. The phone calls from the sister, which he told you, and he asked Freeman on the stand about these phone calls that -- did they happen here at 2:30 in the afternoon?

Yeah, yeah. Remember that's when my sister called me, called me a dickhead, that two people would come and threaten , it's why she had to leave, that's why he couldn't be at the house he was staying at.

Remember all of that? Yeah. Those contacts, they certainly happened. But not when, not how Freeman told you they did.
. . .
So when Freeman sat in that stand, under oath, and told you, oh, yeah, yeah, when my sister called me at 2:30 in the afternoon, her voice was all upset, and she told me that these guys were threatening me, total lie, never happened. There was no provocation. These are text messages from 10:30 at night the day before.

In light of the Court's provision of the mitigating charge on provocation and voluntary manslaughter sought by Defendant, to which the Commonwealth repeatedly and vigorously objected, any alleged error which might have arisen from precluding Ms. Evans from testifying was ameliorated, if not nullified completely.[39] As demonstrated below, by virtue of the Court's provision of the requested voluntary manslaughter charge, and Defendant Counsel's zealous advocacy in his closing argument that Defendant's conduct fell within the ambit of voluntary

---

[37] [N.T. 4/20/18, at 248, 317, Ex. D-7 (Phone Records of I. Freeman)]; [4/23/18, at 118, Ex. D- 7]. (All of the times reflected are in Coordinated Universal Time (UTC time)). [N.T. 4/20/18, at 254-55 ("I ran to where they were going to come from . . . . when they was getting closer, I jumped out, and I shot in their direction.") at 259 ("I knew I was guilty.")].
[38] [N.T. 4/23/18, at 116-219].
[39] [N.T. 4/23/18, at 5, 63, 75]

19

manslaughter, and not homicide, the jury had more than adequate opportunity to consider, and ultimately reject, Defendant's proffered, though completely unsupportable, claim:[40]

Defense Counsel:     Now this is important, the next thing I am going to tell you about. We have testimony from Mr. Freeman -- and I know the DA is going to tell you just don't believe anything he says. I'll address that. But you have testimony from Freeman, corroborated by the phone records. And, you know, the prosecution spent a lot of time on phone records. We, on July 6th, between 10:36am and 11:07, the window of time that we know Scott and Wynder are in Norristown, we know they're there from the phone records, that is when Mr. Freeman gets the call from the sister.

And he testified that his sister was upset, she was yelling at him, she was calling him a dickhead multiple times. And she was upset because two guys could come to the place where they were staying, and as a result they were not going to be able to live there anymore.

So he hears this. He knows who it is. What other two people would it be?

Second piece of serious provocation. Scott and Wynder went to where he lays his head down to sleep at night at that time, and where his sister lays her head down to sleep at night. And he's still either about to come back or leaving Jersey, whatever, when he gets that phone call. And this is . . . uncontradicted testimony. It's uncontradicted in any way. The Commonwealth did not dispute that this phone number, (484)557-1344, they didn't dispute that that phone number was the phone number of his sister.

I mean, believe me, if that wasn't the phone number, you'd hear it from the Commonwealth.

So these calls from his sister to him, this is a fact. And he told you what was going on, one those calls.

Are these first two things -- first two items of provocation the type of provocation that would reasonably be expected to cause emotions to arise in an individual?
                                                  . . .
What kind of emotions would you think that he was having when he knows that these two guys, the very next morning, are no longer

---
[40] [N.T. 4/23/18, at 69- 70, 71, 74-75, 85, 87, 91].

in Pottstown, they're in Norristown, and they just went to his crib, where he lays his head down at night, and he's got his sister freaking out on him?

I emphasize this point because what I'm suggesting to you is, these first two events are the type of events that constitute legitimate serious provocation and the type of things that would cause a reasonable person -- anybody – to experience high emotions. Fear, anger, worry. They went to the house where my sister is with allegedly [*sic*] guns.

. . .

But the point is, the point is, and you cannot be lost on this, this fact cannot be lost on you, these two guys, Scott and Wynder, they're walking to back in the direction where his place of residence was at the time. So Freeman already knows that Scott has threatened that he's going to kill him. He already knows that Scott -- you might not have known him as Wynder, but Scott and another guy are back in Norristown and were looking for him at his place. He knows that from his sister. And then he gets back. And lo and behold, who does he see? And they're walking in this direction where he resides.

Now, I submit to you that the totality of those circumstances absolutely is the type of serious provocation and the type of circumstances that would cause high emotion consisting of fear, anger, worry for his sister. And that's exactly what his state of mind is. And that's why this was heat of passion. That's why those reducing circumstances make this killing a voluntary manslaughter and not murder.

. . .

And that those emotions continued to arise [*sic*] and increase when he got the call from his sister that same morning, that same day of the incident.

. . .

If you have a reasonable doubt -- because, remember, the prosecution has to prove beyond a reasonable doubt -- that there were no reducing circumstances, that he was not acting in the heat of passion, and that there was no serious provocation, if they don't do that -- I don't know how they can, because I would submit this is a classic voluntary manslaughter heat of passion, based on the evidence they have, but that's not for me to decide, that's for you to decide.

. . .

The other phone records that I referred to demonstrate the timing of the call from Isaiah's sister to him, which was later in the morning, late morning. You can look at that. And remember,

21

> you've got to go back four hours earlier because of the way they do it.

Nonetheless, notwithstanding the dearth of support for Defendant's provocation claim, and as stated, in an abundance of caution, the Court granted Defendant's request that it charge the jury on voluntary manslaughter. The jury acted well within its province in weighing the evidence before it and rendering its verdict.

Even assuming his sister called him the morning and/or afternoon of the murder with information that Scott and Wynder were at his house earlier that day, the jury vested with the discretion to weigh the evidence, factually and legally, could reject the assertion that provocation existed justifying the murder hours later at approximately 6:30pm. *See e.g. Commonwealth v. Walker,* 656 A.2d 90, 97 (Pa.1995) (Weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses.);*Commonwealth v. Gibson,* 688 A.2d 1152, 1158 (Pa. 1997) (Specific intent to kill can be inferred by the use of a deadly weapon upon a vital part of the body.); *Commonwealth v. Walker*, 656 A.2d 90, (Pa. 1995) (Evidence sufficient to support first degree murder conviction, contrary to defense of provocation.); *Commonwealth v. McCusker,* 292 A.2d 286, 290 (Pa. 1972) (Trier of fact must consider whether there was insufficient cooling time which would prevent a reasonable man from using his reasoning faculties); *Commonwealth v. Butler*, 288 A.2d 800, 802 (Pa. 1972) (Jury rejected defendant's provocation defense where evidence established sufficient cooling off period.) As noted, despite ample opportunity to flee, and/or call the police, Defendant determined that he was going 'to get them before they got him.' Additionally, Defendant's actions are appropriately viewed against the backdrop of his threats to Scott just days prior that Defendant was going to kill him. *See Commonwealth v. Miller*, 284 A.2d 739, 740 (Pa. 1971)

22

(Record demonstrated ample bases supporting jury's murder conviction where defendant previously threatened victim, and ultimately used a lethal weapon on a vital portion of victim's body.)

Thus, based on Defendant's failure to pursue and preserve his claim in the first instance, and even if preserved, any alleged error was de minimis, as the Court obliged Defendant's voluntary manslaughter instruction request, thereby properly equipping the jury with the legal rubric to render its verdict accordingly. As such, Defendant's claim merits no relief.

## D. Defendant's *Brady* Claim Is Waived And/Or Meritless.

Defendant also asserts that the Commonwealth violated its duty under *Brady v. Maryland* by allegedly "refusing to disclose the contents of Bryce Byrd's phone records."[41] As with Defendant's previous claim, his failure here to identify either the location of, and/or manner in which, he preserved his instant claim hinders the Court's review. Moreover, even if properly preserved, as demonstrated hereinafter, Defendant's *Brady* claim is substantively meritless.

It is well-settled that to preserve a claim on appeal, an appellant must identify each ruling or error with sufficient detail so as to identify the issue for the Court. *See* Pa. R.A.P. 1925(b)(4)(ii). More specifically, Pennsylvania Rule of Appellate Procedure 1925(b) provides:

> (v) Each error identified in the Statement will be deemed to include every
> subsidiary issue contained therein which was raised in the trial court; this
> provision does not in any way limit the obligation of a criminal appellant to
> delineate clearly the scope of claimed constitutional errors on appeal.
> . . .
> (vii) Issues not included in the Statement and/or not raised in accordance with the
> provisions of this paragraph (b)(4) are waived.

Additionally, the interpretive guidance accompanying Rule 1925(b) readily acknowledges that when appellate courts have been critical of sparse or vague Statements, their focus is not on the

---

[41] *Brady v. Maryland*, 373 U.S. 83 (1963).

23

number of issues raised, but rather "the paucity of useful information contained in the Statement." *See* Pa. R.A.P. 1925, Note, ¶ (b)(4).

In this case, not only does Defendant fail to provide the Court as to where in the record he raised and/or preserved any alleged issue as to the contents of the phone records at issue, but the Court was, likewise, unable to locate any such reference in the evidentiary record on review. As such, Defendant failed in the first instance to provide the Court with the requisite specificity to identify his claim.

Even if Defendant had properly preserved his instant claim, he is entitled no relief as he has failed to meet his burden under *Brady*. In *Brady*, the Supreme Court held that the suppression of "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83 at 87 (1963); *Commonwealth v. Wallace*, 455 A.2d 1187, 1190 (Pa. 1983). The burden rests with the defendant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Commonwealth v. Haskins*, 60 A. 3d 538, 547 (Pa. Super. Ct. 2012)

To establish a *Brady* violation, a defendant must demonstrate the following three components: 1.) the evidence at issue must have been suppressed by the State; (2) that evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; and (3) prejudice must have ensued." *Commonwealth v. Weiss*, 81 A.3d 767, 783 (Pa. 2013); *Commonwealth v. Haskins* 60 A.3d 538, 545 (Pa. Super. Ct. 2012) (internal citation omitted). To determine whether a defendant has been prejudiced the court must analyze the materiality of the information at issue. "In engaging in this analysis, a reviewing court is not to review the undisclosed evidence in isolation, but, rather, the omission is to be evaluated in the context of the

24

entire record." *Commonwealth v. Chamberlain*, 30 A.3d 381, 410 (Pa. 2011). Further, the "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, at 109-110 (1976). The Pennsylvania Supreme Court has reaffirmed that the concept of materiality goes beyond the idea that the disputed material might have made a difference at trial.

> "The law governing alleged *Brady* violations is well-settled. In *Brady*, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution.
>
> . . .
>
> On the question of materiality, the Court has noted that such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Commonwealth v. Lambert*, 884 A.2d 848, 853-55 (Pa. 2005) (internal citations omitted); *see also Commonwealth v. Willis*, 46 A.3d 648 at 670 (Pa. 2012) ("The touchstone of materiality is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.")

As a threshold matter, Defendant failed to meet his burden of demonstrating that the Commonwealth withheld Byrd's phone records. *See Weiss*, 81 A.3d at 783. To the contrary, the record reflects that it provided Defendant with the records at issue. Furthermore, and as demonstrated below, Defense Counsel's closing argument was not that the Commonwealth

25

'refused to disclose' Byrd's phone records, but rather that the Commonwealth did not analyze Byrd's phone records which he should not have to spend the time to do:[42]

| Mr. McMahon: | Bryce Byrd . . . this business that he couldn't get out of the car, come on. . . . So they get out of there, and William Wilson drops Bryce Byrd off. Doesn't threaten him. Doesn't say shut your mouth. What could he say William Wilson did do? He decides to exaggerate the story because he gets a deal. But even in his exaggeration, with getting a lawyer, not saying anything for a month, not saying anything about William Wilson hyping him up until the second statement, even with all of that, why doesn't the district attorney present Bryce Byrd's phone records? Why was no analysis done of that? |
|---|---|
| | When I asked him on cross-examination will your phone records indicate where you were the night before? *Not that it matters.* It doesn't matter if he slept at William Wilson's house, whether he did or didn't. But you don't have his phone records. Why would they do an analysis of his records when all it could do is hurt and not help? They have his testimony. Am I going to do an analysis of his phone records? Why was 14 hours of prep necessary? I ask you to ask yourselves, why doesn't he call the police after? |

The argument waives any *Brady* claim. First, it acknowledges that Defense Counsel had the records to analyze if he wanted to spend the time to do so (which he did not); and second, because he concedes the records were not material, as he was not going to spend the time to analyze them since it did not matter what the records would reveal as to Byrd's whereabouts the night before the murder. Finally, (though not actually raised) Defense Counsel's argument, while striving zealously to create reasonable doubt in the minds of the jurors, completely ignores that, once produced, the onus to conduct any analysis of Byrd's phone records was on Defendant, not the Commonwealth. It cannot be a Brady violation for the Commonwealth not to have conducted an analysis of Byrd's phone records; no such obligation exists.

---

[42] [N.T. 4/23/18, at 53-55].

26

In light of Defendant's failure to preserve any claim as to Brady and/or the Commonwealth's alleged failure to 'disclose Byrd's phone records,' Defendant's claim fails. Moreover, even if preserved, Defendant has failed to demonstrate the requisite suppression of that evidence by the Commonwealth, let alone its favorable nature, and/or any ensuing prejudice. As such, Defendant's claim fails.

### E.    Harmless Error.

Finally, and as addressed *supra*, Defendant's contentions on appeal, if deemed preserved, amount to no more than harmless error in light of the abundant credible evidence put forth by the Commonwealth, and thus, merit no relief.[43]

As previously discussed, not all alleged errors entitle a defendant to a new trial, as "an accused is entitled to a fair trial, not a perfect trial." *See West*, 834 A.2d at 634. The Court need not belabor its prior harmless error discussion as it relates to Defendant's *Bruton* claim, *supra.*, Defendant's claims as to the phone records of Bryce Byrd, and Defendant's claim that he was 'prevented' from calling his sister, Ms. Evans, as a witness. Based on Defendant's failure to preserve these claims, the Court's review is constrained. Nonetheless, the record aptly demonstrates that the properly admitted and uncontroverted evidence of guilt, including Defendant's admission that he stalked and lay in wait to murder Scott, extensive video surveillance capturing Defendant doing so, and Defendant's prior vow to murder Scott, is evidence so overwhelming that any alleged prejudice by the claimed errors, individually and

---

[43] An error is harmless where: "(1) the error did not prejudice the defendant or the prejudice was *de minimis;* or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict." *Passmore*, 857 A.2d at 711.

27

collectively, was so insignificant by comparison that the asserted errors could not have contributed to the verdict. *See Passmore, supra.*

## V. CONCLUSION

Accordingly, the trial court requests that the judgment of sentence imposed on Defendant, Isaiah Freeman, on July 10, 2018, be AFFIRMED.

BY THE COURT:

THOMAS C. BRANCA,                    J.

Copies of the above Opinion
Mailed on: 10/25/19
**By First Class Mail:**
Joshua H. Camson, Esquire
**By Interoffice Mail:**
Montgomery County District Attorney - Appellate Division
Court Administration-Criminal

Secretary

28

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA:                    NO. 6135-17
:
v.                                               :
:
ISAIAH FREEMAN                                   :

## ORDERS SUR: SUPPRESSION

Presently before the Court is Defendant's Motion to Suppress his statements made on August 30, 2017, based on his assertion that he did not knowingly, intelligently and voluntarily waive his Miranda rights. After hearing, and review of the applicable case law and the evidence presented, the Court enters the following:

## FINDINGS OF FACT

### August 30, 2017 Statement

1.      On August 30, 2017, at approximately 2:00 p.m., U.S. Marshals located and apprehended Defendant at 5506 North 3rd Street, in Philadelphia, on an outstanding arrest warrant for First Degree Murder, Criminal Conspiracy to Commit First Degree Murder, and related offense, issued by Montgomery County law enforcement. [N.T. 3/22/18, at 149, Ex. CS-10 ("Montgomery County Detectives Homicide Supplemental Report,")

2.      Defendant was already in custody in handcuffs when Detectives Michael Crescitelli ("Det. Crescitelli,") Todd Richard ("Det. Richard,") Greg Henry ("Det. Henry,") and William Mitchel ("Det. Mitchell") arrived at the scene at approximately 2:35 p.m. [N.T. 3/22/18, at 170].

3.      Det. Crescitelli and Det. Richard prepared to transport Defendant, who was in shackles and a handcuff belt, to the Montgomery County Detective Bureau ("the Bureau") in Det. Crescitelli's county assigned vehicle. [N.T. 3/22/18, at 150-52].

4. Both detectives were wearing suits and armed at the time. [N.T. 3/22/18, at 150].

5. Once Defendant was buckled into the car, Det. Richard explained to Defendant that he had the right to be arraigned in Philadelphia County prior to returning to Montgomery County; to which Defendant responded that he wanted to waive his right to be arraigned in Philadelphia County, and go straight to Montgomery County.

6. Defendant immediately began speaking gratuitously adding, without any prompting by detectives, that he wanted to "tell his side of the story." [N.T. 3/22/18, at 150-51, 172].

7. The detectives stopped Defendant, and told him that paperwork needed to be completed back at the Bureau before Defendant spoke, but that he would have an opportunity to speak once they were back at the Bureau; so Defendant stopped speaking. [N.T. 3/22/18, at 152].

8. The three men made small talk for the 30 minute ride in which Defendant told detectives where he grew up, how long he had lived in Norristown, and that he had just graduated from high school. [N.T. 3/22/18, at 152, 175].

9. There was no conversation about the murder until the detectives got Defendant back to the Bureau conference room at approximately 3:02 p.m. [N.T. 3/22/18, at 153].

10. Per protocol, detectives locked their weapons up in the gun locker before they met with Defendant. [N.T. 3/22/18, at 153].

11. Det. Richard asked Defendant if he still wanted to waive his Philadelphia arraignment and read him the waiver form, which Defendant executed while Det. Crescitelli witnessed his signature. [N.T. 3/22/18, at 153-54, at Ex.CS-9 (Voluntary Waiver, Isaiah Freeman," 8/30/17, at 3:05 p.m.)].

12. Defendant was then offered food and beverage and he requested both. It was soon provided. [N.T. 3/22/18, at 154-55].

2

13. Before proceeding further, Det. Crescitelli, as is second nature for him, confirmed that Defendant was not under the influence of any drugs or alcohol, nor was his comprehension impeded by any physical or mental issues. [N.T. 3/22/18, at 157, 17-76].

14. Det. Crescitelli read and explained to Defendant his constitutional rights and witnessed Defendant complete and execute a form waiving those rights at 3:08 p.m. ("Miranda Warnings.") [N.T. 3/22/18, at 155-56, at p. 5 of 5, Ex. CS-10 ("Montgomery County Detectives Homicide Supplemental Report,") 166, Ex. CS-11 ("Criminal History of Isaiah Freeman")].

15. At 3:08 p.m., Det. Crescitelli witnessed Defendant's signature.

16. Det. Crescitelli told Defendant he wanted to speak about the murder investigation, as stated on the Miranda Warnings.

17. With regard to Defendant's execution of his Miranda Warnings, Det. Crescitelli never threatened him to sign, or waive those rights, never made any promises, and never did anything to indicate to Defendant that he had to talk to him. [N.T. 3/22/18, at 156-57].

18. Only after Defendant had received his Miranda Warnings and executed the waiver of his constitutional rights, did he proceed to make a statement.

19. Defendant was talkative, friendly, and pretty relaxed. [N.T. 3/22/18, at 157].

20. Once the food arrived, Defendant's hand restrains were removed so that he could eat, and he was told he could begin to make his statement. [N.T. 3/22/18, at 158].

21. Det. Crescitellli listened as Defendant told his story, interjecting questions from time to time. Once Defendant concluded, Det. Crescitelli confronted him, in a very professional, very calm, and very relaxed tone, with the inconsistencies. [N.T. 3/22/18, at 158-59].

3

22.     Defendant relented on details surrounding two other individuals that detectives knew had been in the Dodge Charger that afternoon, and during the murder; and Defendant explained that he was trying to protect those two individuals. [N.T. 3/22/18, at 159-60].

23.     Defendant admitted that Defendant William Wilson's "god brother" had been in the backseat of the car when the murder took place. [N.T. 3/22/18, at 160].

24.     The detective's demeanor remained calm, relaxed, and professional throughout Defendant's statement. [N.T. 3/22/18, at 160].

25.     Even when the detectives confronted Defendant with inconsistencies, his demeanor was pretty relaxed; and then Defendant told the truth. [N.T. 3/22/18, at 160].

26.     But when they told him they had information that he had exited the front passenger seat of the car, he became upset, and said that Defendant William Wilson and his 'God brother' were trying to frame him. [N.T. 3/22/18, at 161]. Det. Crescitelli had reviewed surveillance footage of the murder scene and he saw the passenger exit the car. [N.T. 3/22/18, at 170].

27.     Detectives stopped the interview because Defendant was getting upset, and told Defendant to finish his sandwich. [N.T. 3/22/18, at 161].

28.     Defendant calmed down, took a few sips of his water, and while Det. Crescitelli was setting up his laptop to put their discussion into a question-and-answer format, Defendant asked the detective if he was "going to get life for this?" [N.T. 3/22/18, at 161]. To which Det. Crescitelli told Defendant it "wasn't up to" him and "his best option right now was to tell the truth." [N.T. 3/22/18, at 161].

29.     Det. Crescitelli told Defendant that, contrary to his statement that the driver had exited the car and shot the victim, the detectives had information that it was actually the front passenger that had exited the car and committed the murder. [N.T. 3/22/18, at 162].

4

30.     Defendant was "very surprised" and "in shock" when he heard this, and immediately put his head down, his hands up to his face, and even started to tear up and cry. After a few minutes, he said he was "going to jail forever." [N.T. 3/22/18, at 162].

31.     Det. Crescitelli tried speaking with Defendant again, and he asked for an attorney for the first and only time since being apprehended earlier. [N.T. 3/22/18, at 162, 164].

32.     Defendant was asked no further questions after that and detectives called the public defender; who had a conflict. [N.T. 3/22/18, at 163].

33.     Other counsel was sought, but after more than 30 minutes passed, detectives told Defendant that he would be transported to Montgomery County Correctional Facility (MCCF). Defendant had no response, but as he was moved from the conference room, Defendant said that he wanted to talk, and tell his side of the story; to which Det. Richard told him it was too late given his invocation of his rights, and that he now needed to be transported to MCCF. [N.T. 3/22/18, at 163-64].

34.     During the entire meeting with Defendant he was never threatened, never made any promises, and nothing was ever done to make Defendant think he had to speak with detectives. Defendant was treated respectfully and professional throughout his meeting. [N.T. 3/22/18, at 165].

35.     Later that day, Det. Crescitelli prepare a detailed police report on the meeting with Defendant. [N.T. 3/22/18, at 165, 168, at Ex. CS-10 ("Montgomery County Detectives Homicide Supplemental Report,") 177].

## CONCLUSIONS OF LAW

1.     Suspects in custody are not entitled to the same considerations that apply to citizens under the Fourth Amendment. However, it is not our intent to diminish the rights afforded prisoners during custodial interrogation. *See Commonwealth v. Watkins,* 750 A.2d 308, 313 (Pa. Super. Ct. 2000) (citing *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968)(an inmate who is questioned

5

by government agents in connection with a case for which he or she is not in custody is still entitled to *Miranda* warnings).

2. "The United States Supreme Court has held that, before law enforcement officers question an individual who has been in taken into custody or has been deprived of his freedom in any significant way, the officers must first warn the individual that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed." *Commonwealth v. Yandamuri*, 159 A.3d 503, 519–20 (Pa. 2017) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

3. To establish that a defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent, the Court must conduct the following two inquiries:

> "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that Miranda rights have been waived.

*Commonwealth v. Cephas*, 522 A.2d 63, 65 (Pa. Super. Ct. 1987).

4. In all cases, including in the context of suppression, the burden of production is on the Commonwealth. Pa. R. Crim. P. 581 cmt. *See Commonwealth v. Enimpah*, 106 A.3d 695, 697 (Pa. 2014). The Commonwealth must

5. Further, "[i]t is for the suppression court as the trier of fact, rather than the reviewing court, to determine credibility." *In Interest of Parks*, 536 A.2d 440, 443 (Pa. Super. Ct. 1988).

6. Contrary to Defendant's assertion his waiver of his Miranda rights was voluntary, knowing, and intelligent.

7. The record aptly demonstrates that after being advised verbally of his rights, Defendant also read and reviewed his rights, and memorialized his voluntary, knowing, and intelligent waiver in writing.

8. In addition, this was not the Defendant's first brush with the law, as reflected by the Commonwealth's admission of his criminal history, going back to 2012 when he was apparently charged with Aggravate Assault. Defendant was also charged with Simple Assault in March 2013, and the following December; Theft By Unlawful Taking, in December 2014; and Robbery, Terroristic Threats, Criminal Conspiracy, Receiving Stolen Property, and other related charges in December 2015.

9. As such, Defendant was well-acquainted with Miranda rights.

10. Defendant was not subject to any threats or promises, nor was anything else done to induce Defendant's waiver of rights.

11. The totality of the circumstances surrounding Defendant's interrogation demonstrate both an uncoerced choice and that Defendant possessed requisite level of comprehension of the consequences attendant to his waiver. As such, Defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent; and his statement legally obtained.

10. Accordingly, the following Order is entered:

7

## ORDER

AND NOW, this 12 day of April 2018, after hearing it is hereby ORDERED that Defendant's

Motion to Suppress is DENIED.

BY THE COURT:

THOMAS C. BRANCA,                    J.

Copies of the above Order
Mailed on 4/13/18
**By First Class Mail to:**
John I. McMahon, Jr., Esquire
A. Charles Peruto, Esquire
**By Interoffice Mail to:**
Samantha L.R. Cauffman, Esquire-Office of the District Attorney
Court Administration

Secretary

8